John DOE, M.D., by Curtis LAVERY,
Executor of his Estate, Plaintiff,

v.

The ATTORNEY GENERAL OF
the UNITED STATES, et al.,
Defendants.

No. C–88–3820–CAL.

United States District Court,
N.D. California.

Dec. 28, 1992.

FINDINGS OF FACT AND
CONCLUSIONS OF
LAW

LEGGE, District Judge.

*Findings of Fact*

1. This case was tried to the court, sitting without a jury, between May 9 and May 17, 1989. The complaint asserts two claims. The first is under 29 U.S.C. § 794, the Rehabilitation Act of 1973, § 504 (the "Act").[1] The second claim is that defendants used private information about plaintiff in violation of his privacy rights under the Due Process Clause of the Fifth Amendment to the United States Constitution.

2. This court issued findings of fact and conclusions of law on August 25, 1989. It determined that plaintiff did not have a private right of action against defendants under Section 504. This court made no other findings or conclusions regarding the Section 504 cause of action. With respect to plaintiff's claim under the Fifth Amendment, the court found that defendants did not violate his right to privacy.

3. This court's decisions were vacated in part, reversed in part, affirmed in part, and remanded by the Ninth Circuit Court of Appeals; *Doe v. Attorney General*, 941 F.2d 780 (9th Cir.1991). The Ninth Circuit held that plaintiff's claim for injunctive relief, the only claim plaintiff made under his Fifth Amendment cause of action, had become moot. It affirmed this court's judgment in favor of defendant Held. The court also held that Congress had waived sovereign immunity and had provided a private right of action for damages for discrimination claims against the United States under Section 504. It therefore reversed this court's contrary conclusion and remanded for this court to make findings on the merits.

The Ninth Circuit held that plaintiff had a "handicap" (AIDS) within the meaning of the

---

1. This section is usually referred to by its public law section number, § 504 of the Act, and that public law reference will be used here.

Act. But it made no determination as to whether (1) plaintiff was "otherwise qualified" to perform medical services for defendants, (2) defendants discriminated against plaintiff solely because he had AIDS, or (3) defendants acted because he refused to disclose information necessary to determine whether he was "otherwise qualified."

4. As a result of the Ninth Circuit's decisions, the only cause of action remaining before this court is plaintiff's claim for damages under Section 504 against the United States.

5. The parties stipulated to submit the issues to this court for decision on the record of the 1989 trial, together with additional filings. This court has reviewed the trial record, the submissions of the parties, the arguments of counsel and the applicable authorities. The court now makes these findings of fact and conclusions of law. The facts are found by a measure of a preponderance of the evidence.

6. Plaintiff died after the 1989 trial, and the executor of his estate has been submitted as the party plaintiff. However, Dr. Doe will be called "plaintiff," herein. Plaintiff was a medical doctor. He was engaged in the private practice of medicine as a doctor employed by, and the director of, a health care facility. The health care facility was controlled by a hospital.[2] Plaintiff received a salary from the facility, and his earnings were in part based upon the earnings of the facility from the patients whom plaintiff treated.

7. The Federal Bureau of Investigation requires that physical examinations, which include anal, vaginal and oral cavity examinations, be performed on all special agents and agent applicants, under the authority of 5 C.F.R. § 339.301. From approximately December 1984 to August 1988, defendants sent all persons who were applicants for employment by the F.B.I. to the facility for preemployment physical examinations, and they sent all employees of the Bureau to the facility for annual and promotion physical examinations. Virtually all of those physical examinations were conducted by plaintiff. Prior to August 1988, no one connected with defendants was dissatisfied with the services performed by plaintiff.

8. Plaintiff contracted Acquired Immune Deficiency Syndrome. On or about August 15, 1988, an unknown person advised defendants that plaintiff had Kaposi's Sarcoma, a contagious AIDS-related illness.

9. FBI Special Agent William Young met with the Director of the facility, Norma Crans, on August 16, 1988. He told her that unsubstantiated information had come to his attention that plaintiff had Kaposi's Sarcoma. He told her that the FBI was concerned about the health risk, if any, to its agents and applicants. He also informed her that the FBI was concerned about the agents not having this information when they were getting their physical examinations. Agent Young said that this was a health related issue because it related to an examining physician having an alleged communicable disease examining the FBI agents and applicants. Ms. Crans told Agent Young that it would be essential that he meet with plaintiff and that she was not in a position to resolve the matter.

10. Agent Young met with plaintiff on August 23, 1988. Agent Young stated that unsubstantiated information had come to the attention of the FBI that a member of the staff of the facility had a communicable disease. Plaintiff asked what the disease was. Agent Young told plaintiff that it was Kaposi's Sarcoma. Plaintiff stated that he believed this information constituted a breach of medical ethics. Agent Young responded that the information had come to the attention of the F.B.I., and they were concerned about the health risk to their agents and applicants. Plaintiff did not confirm or deny the information that someone on the staff had a communicable disease; however, he said that there was no medical risk.

11. Agent Young reported on both of his meetings to the Special Agent in Charge of the San Francisco F.B.I. office, Richard

---

**2.** For reasons of privacy, plaintiff is called "Dr. Doe," the health care facility is called "the facili-

ty," and the hospital is called "the hospital."

Held. They were concerned that their questions about a physician at the facility doing physical examinations while having a communicable disease were not being answered. Mr. Held was concerned that the physician who was performing physical examinations may have a communicable disease, and that the people compelled to see this physician by the FBI were not aware of the medical risks. Mr. Held asked Agents George Clow and Don Whaley to meet with plaintiff and the hospital administrators and raise the questions whether if someone at the facility had a communicable disease the FBI would be told, and what kind of options would be given to employees and applicants.

12. Mr. Held told the FBI nurse that until the issues could be resolved, examinations would be suspended. On or about August 23, 1988, defendants ceased sending persons to the facility for physical examinations, because of defendants' concerns about a possible communicable disease and lack of information from plaintiff, the facility and the hospital.

13. There were subsequent telephone communications between defendants and the facility and the hospital. On September 7, 1988 Agents Clow and Whaley attended a meeting with the administrators of the hospital and plaintiff. Also present were counsel for the hospital and counsel for plaintiff. One of the agents told those present that information had come to the attention of the FBI that a member of the staff of the facility may have AIDS or an AIDS-related disease; and if he asked what the hospital's intentions were if the information was accurate. The FBI agents also expressed their concern about the FBI's duty to its employees concerning the risk of possible transmission of the disease. The agents also expressed their concern as to whether it was the FBI's duty to inform its employees of this information, and its responsibility to other federal agencies who were also using the facility.

Plaintiff and others stated that if medical guidelines were followed, there was no risk to FBI employees. It was also suggested that any fears that FBI employees might have could be alleviated through AIDS education; it was suggested that the FBI provide their employees with that type of education. No other information was provided by plaintiff or the hospital administrators to the FBI agents about whether plaintiff had AIDS or about the risks and the preventions.

Agent Clow again asked whether a health care worker with the facility had an AIDS-related disease. One of the administrators of the hospital responded that he did not know. No one else responded.

14. Defendants lost confidence in plaintiff, the facility and the hospital because they were not responsive to the FBI's concerns and were not being candid.

15. The FBI sought advice on the issues of medical risk, and whether it had any legal obligations to its agents, from its general counsel in Washington.

16. The FBI's questions about whether plaintiff had Kaposi's Sarcoma remained unanswered until plaintiff filed this suit. Dr. Doe filed this suit on September 10, 1988. In an application to file a "John Doe" complaint, plaintiff alleged that he had AIDS.

17. After this court granted a preliminary injunction, defendants entered into agreements with three health care providers, including the facility, for fiscal year 1989. Defendants had lost confidence in the facility and plaintiff, and lacked information about plaintiff's condition and the risks. Defendants also recognized the FBI's legal obligations to its employees. The three purchase agreements gave FBI agents and applicants the opportunity to choose a facility for their physical examinations.

18. Contemporary medical judgment is that if appropriate medical procedures are followed, as plaintiff followed in performing physical examinations, the risk of transmission of infection from a doctor with AIDS to a patient in the course of a routine physical examination is remote. However, a doctor who has open cuts or weeping lesions should refrain from patient care, because the lesions may come in contact with a lesion or cut on the patient. If a lesion is weeping, disease could also be transmitted to a patient if it entered a patient's mucous membranes or an opening in the skin. The risk of such transmission in a routine physical examination,

using the procedures followed by plaintiff, is not significant. However, the information about the risks and plaintiff's procedures were not disclosed to defendants at the time, and were not explained until the trial in this action.

19. Contemporary medical judgment is that a doctor who is infected with AIDS should inform his patients of the infection, and physicians who are asked whether they have AIDS should answer the question directly and truthfully.

20. Contemporary medical judgment is that hospitals should verify that their physicians are complying with the contagious disease guidelines of the Center for Disease Control. These guidelines include periodic monitoring and spot checking of the physicians. The CDC recommendations provide that AIDS infected health care workers should have their work assignments and patient care duties reviewed by a panel of physicians.

Plaintiff was uncertain of the application of CDC guidelines. He gave conflicting testimony on whether there was any supervision or monitoring by the facility to determine if physicians are in compliance with the CDC guidelines. During his deposition he testified that there was no supervision or monitoring by either the facility or the hospital. He described the practice at both the facility and the hospital as one of "self monitoring" by each physician. Plaintiff also testified that the facility is supervised by the hospital through unspecified infection control policies. He was not conversant with the infection control procedures that the hospital uses to supervise the facility. He also testified that the hospital may have verification procedures in place, but he was not conversant with those procedures.

21. In taking the actions described above, defendants did not act solely because of plaintiff's illness. Rather, defendants acted because plaintiff, the facility and the hospital did not answer the FBI's concerns about whether plaintiff had Kaposi's Sarcoma and about the risks and prevention, but provided only conclusory statements. As a result of the minimal information provided by plaintiff, the facility and the hospital, defendants were also unable to determine whether plaintiff was "otherwise qualified" to perform physical examinations for FBI agents and applicants.

### Conclusions of Law

1. Section 504 of the Act prohibits defendants from discriminating against an otherwise qualified handicapped person solely because of the individual's handicap.

2. Title VII standards of proof apply to cases under the Act. See Smith v. Barton, 914 F.2d 1330, 1339–1340 (9th Cir.1990), cert. denied, —— U.S. ——, 111 S.Ct. 2825, 115 L.Ed.2d 995 (1991).

3. The Ninth Circuit has determined that plaintiff was handicapped within the meaning of the Act. Doe v. Attorney General, 941 F.2d 780, 797 (9th Cir.1991).

4. A Section 504 plaintiff must show that he was discriminated against "solely by reason of" his handicap. See Norcross v. Sneed, 755 F.2d 113, 117 n. 5 (8th Cir.1985); Harris v. Adams, 873 F.2d 929, 933 (6th Cir.1989); Leckelt v. Board of Comm'rs of Hosp. Dist. No. 1, 909 F.2d 820, 825 (5th Cir.1990). This issue was not previously determined by this court or the Ninth Circuit.

5. A Section 504 plaintiff must also show that notwithstanding his handicap, he is "otherwise qualified" for the position in question. Title 29 U.S.C. § 794; See School Bd. of Nassau County, Fla. v. Arline, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987). The issue of whether plaintiff was "otherwise qualified" was not previously resolved by this court or by the Ninth Circuit. "In the employment context, an otherwise qualified person is one who can perform 'the essential functions' of the job in question." (quoting 45 C.F.R. § 84.3(k)). Apart from plaintiff's disease, plaintiff was able to perform the essential functions of his job, and defendants were satisfied with his performance up to August 1988.

6. If an individual's disability is a contagious disease, he is not "otherwise qualified" if he poses a significant risk of communicating the disease to others in the workplace. An employer can consider the risks

posed by a physician's contagious disease in determining whether he is "otherwise qualified" to perform physical examinations. The Act permits an employer to make inquiry about an individual's disability if the information sought is relevant to his ability to do the job or to the safety of patients or coworkers. *See Carter v. Casa Cent.,* 849 F.2d 1048, 1056 (7th Cir.1988). *School Board of Nassau County v. Arline,* 480 U.S. 273, 287 n. 16, 107 S.Ct. 1123, 1131 n. 16, 94 L.Ed.2d 307 (1987). This determination requires an individualized inquiry. *Chalk v. United States Dist. Court Cent. Dist. of California,* 840 F.2d 701, 705 (9th Cir.1988).

7. The individualized inquiry requires findings based on reasonable medical judgment, given the present state of medical knowledge, about four factors:

(a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.

*Arline,* 480 U.S. at 288, 107 S.Ct. at 1131. *Chalk,* 840 F.2d at 705. The risk of transmission of a disease in a routine physical examination, using the procedures followed by plaintiff, is not significant. However, the information about the risks and plaintiff's procedures were not disclosed to defendants at the time, and were not explained until the trial in this action.

8. If a plaintiff doctor will not allow the inquiry necessary to determine whether his disease poses a significant risk to patients, he is not "otherwise qualified" for employment. *Leckelt v. Board of Comm'rs of Hosp. Dist. No. 1,* 909 F.2d at 827–830.

9. The Act does not require that defendants dispense with all reasonable precautions or requirements in order to ensure the participation of a handicapped person. *Doe v. New York Univ.,* 666 F.2d 761, 775 (2d Cir.1981). Section 504 simply requires even-handed treatment of the handicapped person who otherwise meets the employment standards "so that he or she will not be discrimi-

nated against *solely* because of the handicap." *Id.*

10. Section 504 requires defendants to make reasonable accommodations to an "otherwise qualified" handicapped employee. An agency can only accommodate an individual based on "what is known about the individual's handicapping condition." *Langon v. United States Dept. of Health and Human Services,* 749 F.Supp. 1, 6 (D.D.C.1990). When a plaintiff refuses to provide information regarding his communicable disease, he prevents defendants from knowing if he has a communicable disease and from deciding what, if any, reasonable measures could protect the patients from the transmission of disease. "In other words, [the physician] prevented [the referring agency] from knowing whether he had a handicap for which federal law arguably required reasonable accommodations." *Leckelt,* 909 F.2d at 830.

11. Defendants' decision to use other health care providers was not based solely on plaintiff's handicap. It was at least in part based on plaintiff's refusal to provide information. His conclusory statements did not inform defendants as to whether plaintiff had a handicapping condition, and they prohibited defendants from determining whether plaintiff was "otherwise qualified" or what reasonable accommodations could be made.

12. Accordingly, the court concludes that judgment should be entered in favor of defendants.

13. Any findings of fact that are in effect conclusions of law should be considered as such. Any conclusions of law that are findings of fact should be deemed findings of fact.