**John DOE, M.D., By Curtis LAVERY, Executor of his Estate, Plaintiff–Appellant,**

v.

**ATTORNEY GENERAL OF the UNITED STATES, et al., Defendants–Appellees.**

No. 93–15253.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 10, 1994.

Decided Aug. 30, 1994.

Matthew A. Coles, American Civ. Liberties Union of Northern CA, San Francisco, CA, for plaintiff-appellant.

Mark B. Stern and Deborah R. Kant, U.S. Dept. of Justice, Washington, DC, for defendants-appellees.

Alice P. Mead, San Francisco, CA, for amicus.

Before: WALLACE, Chief Judge, O'SCANNLAIN, Circuit Judge, and Robert J. KELLEHER,* District Judge.

WALLACE, Chief Judge:

The executor of Dr. Doe's estate (Doe) appeals from the district court's judgment, after a nonjury trial, denying Doe's claim for damages under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Act). The district court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm.

## I

Doe, who died in 1992, was a doctor and director of a health facility in San Francisco (facility) which contracted to perform physical examinations for Federal Bureau of Investigation (FBI) agents. Between 1984 and 1988, FBI agents were required by their employer to undergo yearly examinations, and applicants for employment were required to obtain preemployment examinations at the facility. Doe was the doctor who performed virtually all of the physicals, including anal, vaginal, and oral cavity examinations. His

* Honorable Robert J. Kelleher, United States District Judge, Central District of California, sitting by designation.

salary was based in part on how many examinations he performed.

In 1988, FBI Special Agent in Charge of the San Francisco office, Richard Held, was told by an unnamed source that Doe had Kaposi's Sarcoma, a malignancy consisting of darkened skin lesions and usually associated with Acquired Immune Deficiency Syndrome (AIDS) infection. Held was concerned that he might be exposing his agents to a contagious disease by requiring them to undergo physical examinations by Doe. He assigned agent Young to approach the facility and find out whether any member of the staff had AIDS or Kaposi's Sarcoma, whether there was a risk during physical examinations, and whether anything could be done to alleviate the risk. Agent Young met with Doe, who would not confirm or deny that a staff member had AIDS or Kaposi's Sarcoma. He stated that the FBI should not be concerned because, even if a staff member was infected, there would be no risk to the patients because of the facility's adherence to standard infection control procedures.

Following this meeting with Doe, Held decided that no agents would be scheduled for physical examinations until he resolved whether Doe had a condition which would put the agents at risk. At a subsequent meeting between FBI agents and hospital staff, the FBI again asked if a staff member had AIDS or Kaposi's Sarcoma and about risks to agents. The staff of the facility responded not by confirming or denying whether a staff member had AIDS, but by stating, as had Doe, that they followed accepted infection control procedures and that there was no risk during a physical examination. At trial, FBI agents explained that they lost confidence in the facility after this meeting because of the perception that concerns about the risks to the agents were not being seriously addressed.

Doe filed an action against the FBI, through the Attorney General, alleging violations of section 504 of the Act and of his privacy rights under the due process clause of the Fifth Amendment. In his complaint, he alleged that he had AIDS. Following a leak to the press, it became widely known to the agents in the San Francisco FBI office

that they had been examined by Doe and that Doe had AIDS. After the district court granted a preliminary injunction, the FBI continued to contract with Doe's facility, but also gave agents a choice of two other facilities to attend for their physical examinations. Few agents chose to have their physicals performed by Doe, and his income dropped.

This case comes to us for the second time on appeal from the district court. Only Doe's claim for damages against the government under the Act remains. The first time that this case was before the Ninth Circuit, *Doe v. Attorney General*, 941 F.2d 780 (9th Cir.1991) (*Doe I*), we held that Doe could maintain private claims against the United States, and that all but the claim for damages were rendered moot by Doe's resignation from the facility. We remanded to the district court for a decision on whether the FBI was liable to Doe under the Act.

Based primarily on the testimony that it heard at the trial preceding Doe's first appeal, as well as based on a more recent report on AIDS in the health care setting from the Centers for Disease Control, the district court concluded that the FBI was not liable to Doe. *Doe by Lavery v. Attorney General*, 814 F.Supp. 844, 849 (N.D.Cal.1992) (*Doe II*). The district court found that Doe and the facility gave only conclusory answers to the FBI's questions concerning risk during physical examinations, so that the FBI was unable to tell whether agents were at risk. *Id.* at 848. The district court held that under these facts, the FBI could not be liable to Doe for damages.

■ The interpretation of the Act is a question of law which we review de novo. *See Doe I*, 941 F.2d at 783. We must accept the district court's factual findings unless they are clearly erroneous. *Id.*

## II

At the time this action was filed, section 504 of the Act, 29 U.S.C. § 794(a), provided:

No otherwise qualified individual with handicaps ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any

program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency.

The goal of section 504 is to protect disabled individuals "from deprivation based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns ... as avoiding exposing others to significant health and safety risks." *School Board of Nassau County v. Arline,* 480 U.S. 273, 287, 107 S.Ct. 1123, 1130, 94 L.Ed.2d 307 (1987) *(Arline ).*

■ In order to establish a prima facie case of discrimination under section 504, Doe must show (1) that he is handicapped within the meaning of the Act, (2) that he is otherwise qualified for the job, and (3) that the FBI took adverse action because of his handicap. *See Reynolds v. Brock,* 815 F.2d 571, 574 (9th Cir.1987) *(Reynolds ).* The second and third elements are interrelated "since if the individual is not otherwise qualified he cannot be said to have been rejected solely because of his handicap." *Pushkin v. Regents of University of Colorado,* 658 F.2d 1372, 1385 (10th Cir.1981) *(Pushkin ).* If Doe can establish a prima facie case, "then the burden of producing evidence shifts to the defendant who must demonstrate a legitimate nondiscriminatory reason for terminating" him. *Reynolds,* 815 F.2d at 574. Although Doe maintains the burden to prove liability, he does not have to show "a hostile discriminatory purpose or subjective intent to discriminate." *Smith v. Barton,* 914 F.2d 1330, 1340 (9th Cir.1990), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2825, 115 L.Ed.2d 995 (1991), *quoting Pushkin,* 658 F.2d at 1385.

The first time that his case was before us, we determined that Doe was a "handicapped individual" within the meaning of the Act because he had AIDS. *Doe I,* 941 F.2d at 797. The crucial remaining element of Doe's prima facie case was whether he was "otherwise qualified" to perform routine physicals. *Id.* at 798.

■ "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60

L.Ed.2d 980 (1979). A person with an infectious disease is not otherwise qualified if he "poses a significant risk of communicating an infectious disease to others in the workplace." *Arline,* 480 U.S. at 287 n. 16, 107 S.Ct. at 1130 n. 16. Whether a person with an infectious disease is otherwise qualified "will require individualized inquiry" into the nature, duration, and severity of the risk, as well as "the probabilities the disease will be transmitted and will cause varying degrees of harm." *Doe I,* 941 F.2d at 798, *citing and quoting Arline,* 480 U.S. at 287–88, 107 S.Ct. at 1130–31. In a case dealing with a teacher who had AIDS, we emphasized that the inquiry into whether someone with AIDS is otherwise qualified should focus on whether the risk is significant. *Chalk v. United States District Court,* 840 F.2d 701, 707–09 (9th Cir.1988).

■ When a plaintiff with an infectious disease requests injunctive relief such as to be reinstated, the court makes a determination of whether the employee poses a significant risk according to "the reasonable medical judgments of public health officials." *Arline,* 480 U.S. at 288, 107 S.Ct. at 1131. That is, the current medical knowledge would be significant. However, since this is an action for damages, the relevant liability inquiry deals solely with Doe's qualifications at the time that the FBI took action against him. *Cf. Teahan v. Metro–North Commuter Railroad Co.,* 951 F.2d 511, 519 (2d Cir.1991) (plaintiff's status as "current" substance abuser for purposes of Act determined as of date of actual discharge), *cert. denied,* —— U.S. ——, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992). Thus, because this is an action for damages, we should focus on what the FBI knew at the time it took action about whether Doe posed a significant risk, rather than rely on what we have learned about Doe's qualifications after the extensive expert testimony presented at trial or from subsequent public health reports.

In making this inquiry, we must also keep in mind that one of the goals of the Act is to prevent employers from acting on the basis of misinformed stereotypes and ignorance. *Arline,* 480 U.S. at 284, 107 S.Ct. at 1129;

*Mantolete v. Bolger,* 767 F.2d 1416, 1422 (9th Cir.1985) (*Mantolete*). "Few aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness.... The Act is carefully structured to replace such reflexive reactions to actual or perceived handicaps with action based on reasoned and medically sound judgments." *Arline,* 480 U.S. at 284–85, 107 S.Ct. at 1129. Thus, the Act would not allow the FBI to act solely on misinformed stereotypes in its determination of whether Doe was otherwise qualified to perform the physical examinations. Speaking in the context of an action under section 501 of the Act, which parallels section 504 for the purposes of determining when a person is "otherwise qualified," we stated that an employer is responsible for researching whether an employee is in fact not otherwise qualified, instead of relying on a good faith belief in the stereotypes about the limitations of a disabled employee. *Mantolete,* 767 F.2d at 1422. "Such a determination cannot be based merely on an employer's subjective evaluation." *Id.*

## III

█ The district court found that according to the evidence presented at trial, Doe did not pose a significant risk of infection during routine physical examinations if he followed appropriate medical procedures, which in fact he did. *Doe II,* 814 F.Supp. at 847–48. Thus, if this were an action for injunctive relief, Doe might have been successful in the portion of his prima facie case demonstrating that he was otherwise qualified.

However, because this is an action for damages, the inquiry into whether Doe can make out a case that he was "otherwise qualified" depends on (1) whether the inquiry the FBI agents made was sufficient for us to view their actions as being based on fact rather than misinformed stereotype, and, if this inquiry was sufficient, (2) whether the information available to the FBI indicated that Doe was in fact "qualified," i.e. did not pose a significant risk of infection.

The district court found that the FBI was concerned about risk and prevention and wanted information from the facility on these subjects. However, the facility "did not answer the FBI's concerns" and "provided only conclusory statements." *Id.* at 848. The district court also found that "[t]he FBI sought advice on the issues of medical risk ... from its general counsel in Washington." *Id.* at 847. The facility referred the FBI to the 1987 report from the Centers for Disease Control which discussed the likelihood of an infected health care worker transmitting HIV, the virus that causes AIDS, to a patient. Centers for Disease Control, *Recommendation for Prevention of HIV Transmission in Health–Care Settings,* Morbidity & Mortality Weekly Report Supplement, Aug. 21, 1987. The report indicated that transmission of HIV "would be expected to occur very rarely, if at all." *Id.* at 15S. It recommended adherence to infection control procedures and stated that "the question of whether workers infected with HIV ... can adequately and safely be allowed to perform patient-care duties or whether their work assignments should be changed must be determined on an individual basis." *Id.* at 16S. Based on this report, it was reasonable for the FBI to want to find out details of the facility's infection control procedures and risks associated with the exact procedures that Doe performed. When the FBI agents sought information on the issue of risk and prevention, they were met only with "conclusory statements" in which they had no confidence.

The district court found that "the information about the risks and plaintiff's procedures were not disclosed to defendants at the time, and were not explained until the trial in this action." *Doe II,* 814 F.Supp. at 848. The district court explained, "As a result of the minimal information provided by plaintiff, the facility and the hospital, defendants were also unable to determine whether plaintiff was 'otherwise qualified' to perform physical examinations for FBI agents and applicants." *Id.* It concluded that the FBI was not liable to Doe because, "[i]f a plaintiff doctor will not allow the inquiry necessary to determine whether his disease poses a significant risk to patients, he is not 'otherwise qualified' for employment." *Id.* at 849.

We read the district court's findings of fact to indicate that the FBI made a genuine attempt to find out if Doe would pose a risk, and was prevented from doing so because the facility responded with the evasive answers and communicated to the agents a lack of serious concern for the possible risk. This finding is not clearly erroneous. Thus, based on the district court's findings of fact, we hold that Doe has not carried his burden to make a prima facie case that he was otherwise qualified for the purposes of this action for damages. He has not shown, as he must, that the FBI made an insufficient inquiry into the nature of the risk; nor has he shown, as was his burden, that based on the information available to the FBI in 1988, at the time they took action regarding the risk posed by Doe, it could have determined that he was otherwise qualified. Thus, Doe has failed in his burden to prove liability against the Attorney General.

Doe points out that the district court found that the FBI's actions were also based partly on their desire to know whether Doe had AIDS, not just whether there was a hypothetical risk, taking into account the infection control procedures followed by the facility. *Doe II,* 814 F.Supp. at 849 ("Defendant's decision ... was at least in part based on plaintiff's refusal to provide information. His conclusory statements did not inform defendants as to whether plaintiff had a handicapping condition."). Nevertheless, the district court held that the FBI did not violate the Act.

■ The district court stated that "[t]he Act permits an employer to make inquiry about an individual's disability if the information sought is relevant to his ability to do the job or to the safety of patients or coworkers." *Id.* We agree with this statement of the law. Under the Act, an employer may not demand to know if an employee has a disability unless this knowledge is relevant to determining whether the person is otherwise qualified for the position. In reaching this conclusion, we follow the view of the agencies that have interpreted section 504, both in pre- and post-employment contexts. Although this case concerns an ongoing, renewable contract involving a doctor already officially employed by the FBI, and thus is not fully analogous to either a pre- or post-employment situation, we hold that the policies behind the employment provisions of the regulations interpreting section 504 apply to our analysis.

The regulations of the Department of Health and Human Services, which "were drafted with the oversight and approval of Congress" and "provide an important source of guidance on the meaning of § 504," *Arline,* 480 U.S. at 279, 107 S.Ct. at 1126, state that an employer "may not make preemployment inquiry ... as to whether the applicant is a handicapped person or as to the nature or severity of the handicap. A[n employer] may, however, make preemployment inquiry into an applicant's ability to perform job-related functions." 45 C.F.R. § 84.14 (1993). The agency's analysis in Appendix A to the regulations states that "an employer may inquire into an applicant's ability to perform job-related tasks but may not ask if a person has a handicap.... Similarly, employers may make inquiries about an applicant's ability to perform a job safely. Thus, an employer may not ask if an applicant is an epileptic but may ask whether the person can perform a particular job without endangering other employees." The regulations applicable to post-employment practices state that an employer "may not make use of any employment test or other selection criterion that screens out or tends to screen out handicapped persons" unless it "is shown to be job-related for the position in question." 45 C.F.R. § 84.13(a) (1993).

■ It was relevant for the FBI agents to ask if Doe had AIDS because they did not receive sufficient answers to inquiries about the possible risk and preventions employed. We again make clear that, based on the knowledge that was available to the FBI in 1988, it was permissible for the FBI to insist on answers to its questions about such risks and prevention. The information available to someone in the FBI's position might be different today, but that issue is not before us. After the requested information was not forthcoming, the only other way to try to find out if there might be a risk was to insist directly on knowing whether Doe had AIDS;

this became "relevant" information. Thus, the FBI did not violate the Act although it acted partly based on its desire to find out if Doe had AIDS.

Because both inquiries were permitted on the facts of this case, we do not consider Doe's argument that this is a "mixed motive" case where the FBI was motivated by both permissible and impermissible motives, and, therefore, we are not required to decide whether to apply a causation test analogous to that applied in Title VII mixed motive cases. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

AFFIRMED.