**John DOE, M.D., by Curtis LAVERY, Executor of his Estate, Plaintiff–Appellant,**

v.

**ATTORNEY GENERAL OF THE UNITED STATES, et al., Defendants–Appellees.**

No. 93–15253.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 10, 1994.

Opinion Filed Aug. 30, 1994.

Opinion Withdrawn January 18, 1995.

Decided Jan. 18, 1995.

716

Matthew A. Coles, American Civil Liberties Union of Northern California, San Francisco, CA, for plaintiff–appellant.

Mark B. Stern and Deborah R. Kant, U.S. Dept. of Justice, Washington, DC, for defendants-appellees.

Alice P. Mead, San Francisco, CA, for amicus.

Before: WALLACE, Chief Judge, O'SCANNLAIN, Circuit Judge, and KELLEHER,* District Judge.

### ORDER

The opinion filed in this case on August 30, 1994, reported at 34 F.3d 781 (9th Cir.1994), is withdrawn.

### OPINION

WALLACE, Chief Judge:

The executor of Dr. Doe's estate appeals from the district court's judgment, after a nonjury trial, denying Dr. Doe's claim for damages under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Act). The district court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm.

### I

Dr. Doe, who died in 1992, was a medical doctor and director of a health facility in San Francisco (facility) which contracted to perform physical examinations for Federal Bureau of Investigation (FBI) agents. Between 1984 and 1988, FBI agents were required by their employer to undergo yearly examinations, and applicants for employment were required to obtain preemployment examinations at the facility. Dr. Doe was the doctor who performed virtually all of the physicals, including anal, vaginal, and oral cavity examinations. His salary was based in part on how many examinations he performed.

In 1988, FBI Special Agent in Charge of the San Francisco office, Richard Held, was told by an unnamed source that Dr. Doe had Kaposi's Sarcoma, a malignancy consisting of darkened skin lesions and usually associated with Acquired Immune Deficiency Syndrome (AIDS) infection. Held was concerned that he might be exposing his agents to a contagious disease by requiring them to undergo physical examinations by Dr. Doe. He assigned agent Young to approach the facility and find out whether any member of the staff had AIDS or Kaposi's Sarcoma, whether there was a risk during physical examinations, and whether anything could be done to alleviate the risk. Agent Young met with Dr. Doe, who would not confirm or deny that a staff member had AIDS or Kaposi's Sarcoma. Dr. Doe stated that the FBI should not be concerned because, even if a staff member were infected, there would be no risk to the patients because of the facility's adherence to standard infection control procedures.

Following this meeting with Dr. Doe, Held decided that no agents would be scheduled for physical examinations until he resolved whether Dr. Doe had a condition which would put the agents at risk. At a subsequent meeting between FBI agents and hospital staff, the FBI again asked if a staff member had AIDS or Kaposi's Sarcoma and about risks to agents. The staff of the facility responded not by confirming or denying whether a staff member had AIDS, but by stating, as had Dr. Doe, that they followed accepted infection control procedures and that there was no risk during a physical

---

* Honorable Robert J. Kelleher, United States District Judge, Central District of California, sitting by designation.

examination. At trial, FBI agents explained that they lost confidence in the facility after this meeting because of the perception that concerns about the risks to the agents were not being seriously addressed.

Dr. Doe filed an action against the FBI, through the Attorney General, alleging violations of section 504 of the Act and of his privacy rights under the due process clause of the Fifth Amendment. In his complaint, he alleged that he had AIDS. Following a leak to the press, it became widely known to the agents in the San Francisco FBI office that they had been examined by Dr. Doe and that Dr. Doe had AIDS. After the district court granted a preliminary injunction, the FBI continued to contract with Dr. Doe's facility, but also gave agents a choice of two other facilities to attend for their physical examinations. Few agents chose to have their physicals performed by Dr. Doe, and his income dropped.

This case comes to us for the second time on appeal from the district court. Only Dr. Doe's claim for damages against the government under the Act remains. The first time that this case was before the Ninth Circuit, *Doe v. Attorney General*, 941 F.2d 780 (9th Cir.1991) (*Doe I*), we held that Dr. Doe could maintain private claims against the United States, and that all but the claim for damages were rendered moot by Dr. Doe's resignation from the facility. We remanded to the district court for a decision on whether the FBI was liable to Dr. Doe under the Act.

Based primarily on the testimony that it heard at the trial preceding Dr. Doe's first appeal, as well as based on a more recent report on AIDS in the health care setting from the Centers for Disease Control (CDC), the district court concluded that the FBI was not liable. *Doe by Lavery v. Attorney General*, 814 F.Supp. 844, 849 (N.D.Cal.1992) (*Doe II*). The district court found that Dr. Doe and the facility gave only conclusory answers to the FBI's questions concerning risk during physical examinations, so that the FBI was unable to tell whether agents were at risk. *Id.* at 848. The district court also found that Dr. Doe gave conflicting testimony concerning whether there was any supervision or monitoring by the facility, as re-

quired by the CDC guidelines, and further found that Dr. Doe did not have a good grasp of the hospital procedures. *Id.* The district court held that under these facts, the FBI was not liable to Dr. Doe for damages.

■■■ The interpretation of the Act is a question of law that we review de novo. *See Doe I*, 941 F.2d at 783. We must accept the district court's factual findings unless they are clearly erroneous. *Id.*

## II

■ At the time this action was filed, section 504 of the Act, 29 U.S.C. § 794(a), provided:

No otherwise qualified individual with handicaps ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency.

The goal of section 504 is to protect disabled individuals "from deprivation based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns ... as avoiding exposing others to significant health and safety risks." *School Board of Nassau County v. Arline*, 480 U.S. 273, 287, 107 S.Ct. 1123, 1131, 94 L.Ed.2d 307 (1987) (*Arline*).

■■■ In order to establish a prima facie case of discrimination under section 504, it must be shown that (1) Dr. Doe was handicapped within the meaning of the Act, (2) he was otherwise qualified for the job, (3) he worked for a program conducted by any executive agency or receiving federal financial assistance, and (4) that the FBI took adverse action *solely* because of his handicap. *See Jackson v. Veterans Administration*, 22 F.3d 277, 278 (11th Cir.1994) (*Jackson*); *see Reynolds v. Brock*, 815 F.2d 571, 574 (9th Cir.1987) (*Reynolds*). The second and fourth elements are interrelated "since if the individual is not otherwise qualified he cannot be said to have been rejected solely because of his handicap." *Pushkin v. Regents of University of Colorado*, 658 F.2d 1372, 1385 (10th

Cir.1981) (*Pushkin*). If Dr. Doe can establish a prima facie case, "then the burden of producing evidence shifts to the defendant who must demonstrate a legitimate nondiscriminatory reason for terminating" him. *Reynolds,* 815 F.2d at 574. Although Dr. Doe maintains the burden to prove liability, he does not have to show "a hostile discriminatory purpose or subjective intent to discriminate." *Smith v. Barton,* 914 F.2d 1330, 1340 (9th Cir.1990), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2825, 115 L.Ed.2d 995 (1991), *quoting Pushkin,* 658 F.2d at 1385.

The first time that his case was before us, we determined that Dr. Doe was a "handicapped individual" within the meaning of the Act because he had AIDS. *Doe I,* 941 F.2d at 797. The next element of Dr. Doe's prima facie case was whether he was "otherwise qualified" to perform routine physicals. *Id.* at 798.

▋ "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). A person with an infectious disease is not otherwise qualified if he "poses a significant risk of communicating an infectious disease to others in the workplace." *Arline,* 480 U.S. at 287 n. 16, 107 S.Ct. at 1131 n. 16. Whether a person with an infectious disease is otherwise qualified "will require individualized inquiry" into the nature, duration, and severity of the risk, as well as "the probabilities the disease will be transmitted and will cause varying degrees of harm." *Doe I,* 941 F.2d at 798, *citing and quoting Arline,* 480 U.S. at 287–88, 107 S.Ct. at 1130–31. In a case dealing with a teacher who had AIDS, we emphasized that the inquiry into whether someone with AIDS is otherwise qualified should be individualized, and focus on whether the risk is significant. *Chalk v. United States District Court,* 840 F.2d 701, 707–09 (9th Cir.1988).

▋ When a plaintiff with an infectious disease requests injunctive relief such as to be reinstated, the court makes a determination of whether the employee poses a significant risk according to "the reasonable medical judgments of public health officials." *Ar-line,* 480 U.S. at 288, 107 S.Ct. at 1131. That is, the current medical knowledge would be significant. However, since this is an action for damages, the relevant liability inquiry deals solely with Dr. Doe's qualifications at the time that the FBI took action against him. *Cf. Teahan v. Metro–North Commuter Railroad Co.,* 951 F.2d 511, 519 (2d Cir.1991) (plaintiff's status as "current" substance abuser for purposes of Act determined as of date of actual discharge), *cert. denied,* —— U.S. ——, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992). Thus, because this is an action for damages, we focus on what the FBI knew or should have known, at the time it took action, about whether Dr. Doe was otherwise qualified to perform his job, *Mantolete v. Bolger,* 767 F.2d 1416, 1422 (9th Cir.1985) (*Mantolete*), rather than rely on what we or the FBI have learned about Dr. Doe's risk of transmission and the facility's infection control procedures after the extensive expert testimony presented at trial or from subsequent public health reports.

In making this inquiry, we must also keep in mind that one of the goals of the Act is to prevent employers from acting on the basis of misinformed stereotypes and ignorance. *Arline,* 480 U.S. at 284, 107 S.Ct. at 1129; *Mantolete,* 767 F.2d at 1422. "Few aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness.... The Act is carefully structured to replace such reflexive reactions to actual or perceived handicaps with action based on reasoned and medically sound judgments." *Arline,* 480 U.S. at 284–85, 107 S.Ct. at 1129. Thus, the Act would not allow the FBI to act solely on misinformed stereotypes in its determination of whether Dr. Doe was otherwise qualified to perform the physical examinations. Speaking in the context of an action under section 501 of the Act, which parallels section 504 for the purposes of determining when a person is "otherwise qualified," we stated that an employer is responsible for researching whether an employee is in fact not otherwise qualified, instead of relying on a good faith belief in the stereotypes about the limitations of a disabled employee. *Mantolete,* 767 F.2d at 1422. "Such a determination cannot be

based merely on an employer's subjective evaluation." *Id.*

## III

The district court found that according to the evidence presented at trial, Dr. Doe did not pose a significant risk of infection during routine physical examinations if he followed appropriate medical procedures. However, the district court also found that Dr. Doe was uncertain about the application of the CDC guidelines, gave conflicting statements regarding whether there was appropriate supervision or monitoring by the facility, as the guidelines require, and that Dr. Doe himself was not conversant with the infection control procedures used at the facility. *Doe II,* 814 F.Supp. at 847–48. The district judge found that the FBI lost confidence in Dr. Doe and the facility staff because they were not responsive to the FBI's concerns and were not being candid. *Id.* at 847.

Because this is an action for damages, the inquiry into whether Dr. Doe can make out a case that he was "otherwise qualified" depends on (1) whether the inquiry the FBI agents made was sufficient for us to view their actions as being based on fact rather than misinformed stereotype, and, if this inquiry was sufficient, (2) whether the information available to the FBI indicated that Dr. Doe was "qualified," i.e. did not pose a significant risk of infection.

The district court found that the FBI was concerned about risk and prevention and wanted information from the facility on these subjects. However, the facility "did not answer the FBI's concerns" and "provided only conclusory statements." *Id.* at 848. The district court also found that "[t]he FBI sought advice on the issues of medical risk ... from its general counsel in Washington." *Id.* at 847. The facility referred the FBI to the 1987 report from the CDC which discussed the likelihood of an infected health care worker transmitting HIV, the virus that causes AIDS, to a patient. CDC, *Recommendation for Prevention of HIV Transmission in Health–Care Settings,* Morbidity & Mortality Weekly Report Supplement, Aug. 21, 1987. The report indicated that trans-

mission of HIV "would be expected to occur very rarely, if at all." *Id.* at 15S. It recommended adherence to infection control procedures and stated that "the question of whether workers infected with HIV ... can adequately and safely be allowed to perform patient-care duties or whether their work assignments should be changed must be determined on an individual basis." *Id.* at 16S. Based on this report, it was reasonable for the FBI to want to find out details of the facility's infection control procedures and risks associated with the exact procedures that Dr. Doe performed. When the FBI agents sought information on the issue of risk and prevention, they were met only with "conclusory statements" in which they had no confidence.

The district court found that "the information about the risks and plaintiff's procedures were not disclosed to defendants at the time, and were not explained until the trial in this action." *Doe II,* 814 F.Supp. at 848. The district court explained, "[a]s a result of the minimal information provided by plaintiff, the facility and the hospital, defendants were also unable to determine whether plaintiff was 'otherwise qualified' to perform physical examinations for FBI agents and applicants." *Id.* It concluded that the FBI was not liable to Dr. Doe because, "[i]f a plaintiff doctor will not allow the inquiry necessary to determine whether his disease poses a significant risk to patients, he is not 'otherwise qualified' for employment." *Id.* at 849.

The district court also found, as discussed earlier, that Dr. Doe was not aware of what infection control procedures the facility actually used, and described the facility as being engaged in "self monitoring" as opposed to the kind of supervision or monitoring program that the CDC guidelines recommend, such as "periodic monitoring and spot checking." *Id.* at 848. Because of the individualized inquiry that must be made, the FBI was justified in asking about the details of the procedures that were purportedly followed.

We read the district court's findings of fact to indicate that the FBI made a genuine attempt to find out if Dr. Doe would pose a risk, and was prevented from doing so be-

cause the facility responded with the evasive answers about what infection control procedures were in place and communicated to the agents a lack of serious concern for the possible risk. These findings are not clearly erroneous. Thus, based on the district court's findings of fact, we hold that Dr. Doe has not carried his burden to make a prima facie case that he was otherwise qualified for the purposes of this action for damages. He has not shown, as he must, that the FBI made an insufficient inquiry into the nature of the risk; nor has he shown, as was his burden, that based on the information available to the FBI in 1988, at the time they took action regarding the risk posed by Dr. Doe, it could have determined that he was otherwise qualified. Thus, Dr. Doe has failed in his burden to prove liability against the Attorney General.

## IV

 This ordinarily would end this appeal: the district court correctly determined that Dr. Doe did not prove the necessary "otherwise qualified" prong of his prima facie case. But it is pointed out that the district court also found that the FBI, when trying to discover if Dr. Doe was "otherwise qualified," sought to discover whether Dr. Doe had AIDS. *Id.* at 847. It is contended that such an inquiry violated the Act, and that reversal is required. The district court held that the FBI's "decision to use other health care providers ... [was] in part based on plaintiff's refusal to provide information. His conclusory statements did not inform defendants as to whether plaintiff had a handicapping condition." *Id.*

This holding raises the issue, regardless of the inquiry by the FBI, was the termination "solely by reason [of Dr. Doe's] handicap"? 29 U.S.C. § 794(a). Of course, analysis of that issue is more complicated in a case, such as this, where the handicap is not obvious and not divulged. What precautions or inquiries may an employer make and still not run afoul of the Act? And even if one of the reasons the FBI terminated Dr. Doe's service was that it suspected his AIDS disease, was he terminated "solely by reason of [his] handicap"? *Id.*

Although these are important questions, they need not be determined by us to resolve this appeal. Assuming, but not holding, that in this case the inquiry whether Dr. Doe had AIDS was impermissible, we need not reverse the district court.

The district court found that the FBI's motivation for firing Dr. Doe was not based on the suspicion that he *had* AIDS. The district court found that the FBI was motivated by Dr. Doe's and the facility's lack of candor and conclusory statements about procedure. The FBI could not determine, after reasonable inquiry, whether Dr. Doe was "otherwise qualified." These findings are not clearly erroneous. There is no evidence that the FBI was motivated to fire Dr. Doe because of his handicap. It might be true that the FBI wanted to know whether Dr. Doe had AIDS, but it asked this question in the course of trying to determine whether Dr. Doe was "otherwise qualified." Even if that question was impermissible, therefore, the motivation for firing Dr. Doe—e.g. the inability, after reasonable inquiry, to determine whether he was "otherwise qualified" to perform his job—does not change.

This approach becomes clear when analyzing the steps necessary to be successful in an action under the Act. As stated in *Jackson:*

> To prove discrimination under the Act, a plaintiff must show that he or she: (1) is "handicapped" within the meaning of the Act and relevant regulations, (2) is "otherwise qualified" for the position in question, (3) worked for a Program or activity that received federal financial assistance, and (4) was adversely treated solely because of his or her handicap.

*Jackson,* 22 F.3d at 278; *see also Reynolds,* 815 F.2d at 574. Because Dr. Doe unsuccessfully met his second burden of proof ("otherwise qualified"), we need not reach his fourth burden of proof: whether he was terminated solely due to this handicap.

It is argued, however, that the FBI's inquiries into whether Dr. Doe had AIDS turn this case into a "mixed motive" case. This inquiry could lead us to determine whether the word "solely" in section 504 means what it says. The resolution of that issue must

**722**

await another case, however. Under the facts found by the district court, the FBI acted with one and only one motivation: to discover if Dr. Doe posed a significant risk to his patients. The inability of the FBI to determine if Dr. Doe was "otherwise qualified" led it to terminate him. Asking whether Dr. Doe had AIDS was not an inquiry that the FBI made independent of the overall inquiry, and was not a reason for terminating Dr. Doe. Dr. Doe was terminated, as the district court found, for the permissible reason that the FBI could not determine, after reasonable inquiry, that Dr. Doe was "otherwise qualified" to perform his job.

AFFIRMED.