62 F.3d 1424
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
John DOE, M.D., by Curtis LAVERY, Executor of his Estate,
Plaintiff-Appellant,
v.
ATTORNEY GENERAL of the UNITED STATES, et al., Defendants-Appellees.
 No. 93-15253.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 10, 1994.
Opinion Withdrawn Jan. 17, 1995.
Opinion Filed Jan. 18, 1995.
Opinion Withdrawn June 28, 1995.
Decided June 30, 1995.
 
 Before: WALLACE, Chief Judge; O'SCANNLAIN, Circuit Judge; and KELLEHER,* District Judge.
 MEMORANDUM**
 * Dr. Doe, who died in 1992, was a medical doctor and director of a health facility which contracted to perform physical examinations for agents of the Federal Bureau of Investigation ("FBI"). In 1988, the FBI was told by an unnamed source that Dr. Doe had Kaposi's Sarcoma, a malignancy often associated with Acquired Immune Deficiency Syndrome ("AIDS"). The FBI asked Dr. Doe and the facility if Dr. Doe had AIDS. Dr. Doe and the facility would not confirm that he had AIDS, but assured the FBI that they followed standard infection control procedures; therefore, Dr. Doe's routine exams posed no risk to patients. Within a week, however, the FBI stopped sending agents to Dr. Doe.
 This case comes to us for the second time on appeal. On remand, the district court, after a nonjury trial, rejected Dr. Doe's claim for damages under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Sec. 794 ("the Act"). The executor of Dr. Doe's estate appeals.
 II
 The interpretation of the Act is a question of law that we review de novo. However, we review the district court's findings of fact for clear error.
 At the time this action was filed, section 504 of the Act, 29 U.S.C. Sec. 794(a), provided:
 No otherwise qualified individual with handicaps ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency.
 The goal of section 504 is to protect disabled individuals "from deprivation based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns ... as avoiding exposing others to significant health and safety risks." School Board of Nassau County v. Arline, 480 U.S. 273, 287 (1987).
 In order to recover, Dr. Doe must show that he was an otherwise qualified handicapped individual for purposes of the Act, and that he was terminated solely because of his handicap. The first time that his case was before us, we determined that Dr. Doe was a "handicapped individual" within the meaning of the Act. Doe v. Attorney General, 941 F.2d 780, 797 (9th Cir. 1991). We now must determine whether he was "otherwise qualified" to perform routine physicals, and if so, whether he was terminated solely by reason of his handicap.
 * The Supreme Court has held that a person with an infectious disease is otherwise qualified for a position if he does not pose "a significant risk of communicating [the] disease to others in the workplace." Arline, 480 U.S. at 287 n.16. Here, the district court found that "if appropriate medical procedures are followed, ... the risk of transmission of infection from a doctor with AIDS to a patient in the course of a routine physical examination is remote." This conclusion was supported by unanimous expert testimony at trial.
 The district court nevertheless found in favor of the FBI. The district court found that Dr. Doe and the hospital gave "conclusory statements" in response to the questions posed by the FBI, and that this "minimal information" prevented the FBI from determining whether Dr. Doe was "otherwise qualified" for the position. However, we must conclude that the district court's finding is not supported by the record.
 Before taking adverse action against an employee, an employer has a duty under the Act to gather sufficient information from the employee and from qualified experts to determine whether the employee is otherwise qualified for the position. Mantolete v. Bolger, 767 F.2d 1416, 1423 (9th Cir. 1985). Because Dr. Doe had a contagious disease, the FBI's concern under the Act should have been to determine whether Dr. Doe posed a substantial risk of communicating the disease. It would have been perfectly appropriate, therefore, for the FBI to inquire in detail about the infection control procedures used to ensure that FBI employees were not placed at risk.
 The district court record reveals, however, that the FBI expressed little concern about the hospital's infection control procedures. The record shows that Dr. Doe and the hospital were entirely forthcoming about these procedures, but that their explanations fell on deaf ears. When the hospital explained why its infection control procedures prevented risk of transmission to any agents, the FBI showed no interest in pursuing the inquiry further, by asking, for instance, about the nature, character, use, or effectiveness of the procedures. Rather, the FBI focused their attention on only one question: whether or not Dr. Doe had AIDS.[1]
 Indeed, the district court's findings on the nature of the FBI's inquiries accord with this view. The district court found that at an August 23, 1988 meeting between Dr. Doe and Agent Young, Dr. Doe did not confirm or deny whether anyone at the hospital either had a communicable disease or Kaposi's Sarcoma, "but did say that there was no medical risk." The district court further found that on or about the same day, the FBI suspended Dr. Doe's employment "because of [its] concerns about a possible communicable disease and lack of information from plaintiff, the facility and the hospital."
 The FBI concedes that they were informed that there was no risk to FBI employees because infection control procedures were followed; however, they assert that "[n]o other information was provided by Dr. Doe or the hospital administrators." The FBI, however, misconceives its role under the Act. As employer, the FBI had the duty to gather substantial information based on objective evidence of risk and not on misinformed stereotypes. Mantolete, 767 F.2d at 1423. If the FBI had been legitimately concerned about the risk of transmission, it would have inquired as to the character and effectiveness of the infection control procedures used, as it was required to do by the Rehabilitation Act. It made no attempt to do so.[2]
 In sum, the district court record is devoid of any evidence indicating that the hospital or Dr. Doe were not candid with respect to questions posed about infection control. Rather, the record reveals that they were evasive only with respect to answering whether or not Dr. Doe had AIDS. Because this latter question is irrelevant to the determination of whether Dr. Doe was "otherwise qualified" under the Act, and because the FBI made no attempt to satisfy its duty to gather evidence on the issue, we conclude that Dr. Doe was otherwise qualified.
 B
 We now consider whether Dr. Doe was terminated "solely by reason of ... his handicap." 29 U.S.C. Sec. 794(a). The district court found that the FBI's
 decision to use other health care providers was not based solely on plaintiff's handicap. It was at least in part based on plaintiff's refusal to provide information. His conclusory statements did not inform defendants as to whether plaintiff had a handicapping condition, and they prohibited defendant from determining whether plaintiff was "otherwise qualified or what reasonable accommodations could be made.
 Dr. Doe asks us to hold that the district court improperly defined the phrase "solely by reason of his handicap" when it found, in essence, that a section 504 violation does not occur if a defendant has both proper and improper motives for terminating a handicapped employee. However, we have no need to reach that question here because the FBI has not asserted any legitimate reasons for terminating Dr. Doe.
 The district court found that the FBI terminated Dr. Doe, not merely because of his handicap, but also because he refused to provide the FBI with information. As stated above, the "missing" information pertained not to infection control procedures, but to whether or not Dr. Doe had AIDS. As we have noted, this latter inquiry is irrelevant for determining whether Dr. Doe was "otherwise qualified" under the Act. Further, several witnesses testified that the purpose for asking Dr. Doe if he had AIDS was in order to replace him if he did. Hence, we cannot help but conclude that the FBI terminated Dr. Doe "solely by reason of his handicap," even as that phrase is most strictly defined.
 III
 We reverse the judgment of the district court and remand for a determination of damages.
 REVERSED and REMANDED.
 
 WALLACE, Chief Judge, dissenting:
 
 1
 I dissent. The majority, at this late date, changes its position and concludes that the district court should be reversed because its findings are clearly erroneous. Regardless of how any of us would decide the case had we been the district judge, I cannot say these findings are clearly erroneous.
 
 
 2
 The record shows that the FBI wanted to know if Dr. Doe had AIDS. That was never disputed. But that does not mean that the FBI fired Dr. Doe because he had the disease. Rather, the evidence is sufficient for a finding that the firing of Dr. Doe was motivated by the FBI's lost confidence in the hospital. At the very least, that finding is not clearly erroneous.
 
 
 3
 For the reasons stated in the withdrawn opinion of Doe v. Attorney General, 44 F.3d 715 (9th Cir. 1995), I would affirm the judgment of the district court.
 
 
 
 *
 The Honorable Robert J. Kelleher, Senior United States District Judge for the Central District of California, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The direct testimony of FBI Agent Clow about a meeting between the FBI and hospital staff members is revealing:
 A: At that point a discussion ensued in basically a number of people, including Dr. Doe, assured us that if medical guidelines were followed, there would be no risk to our employees that this would be the case.
 Q: What discussion do you recall about the medical guidelines?
 A: It was in the context of the nature of the examinations themselves, that went to rectal examinations for males, pelvic examinations for females.
 And that if the guidelines, and I don't remember if any particular agency's guidelines were specified, but if the medical guidelines were followed, they were being assured basically that there would be no risk that would accrue to our employees.
 And further that possibly through AIDS education any fears that our employees might have in that regard could be allayed, and the suggestion was made that we avail our employees of that type of education.
 Q: Do you recall any other topics being discussed at the September 7 meeting?
 A: It was at some point in the discussion that ... again, everything is being discussed hypothetically, if this being the case, we were told there would be no risk to our employees.... If it not be the case that a health care worker with the [hospital] has this disease, then all of this discussion is really moot.
 And I asked point blank is there a member of the [hospital] who has this disease.
 Q: Did anyone respond?
 A: Mr. Monardo responded. He was the only one who did, and he said, I don't know.
 Q: Did anyone else respond?
 A: No one else said anything to that.
 Q: What happened at that point?
 A: Well, I felt a loss of confidence in the people who were present at the meeting, not being responsive to my concern and to the... one of the purposes of our visit, announced purpose of the visit, and further that they were not being candid with us.
 (emphasis added).
 The testimony of the hospital's clinical director, Nora Crans, also reveals that the FBI learned that Dr. Doe was using standard infection control procedures. Crans referred the FBI special agent to Dr. Doe directly. They later spoke about that conversation.
 Q: Can you tell me what you recall of that conversation?
 A: Yes. I asked him how the meeting went with Dr. Doe. He stated that it was somewhat puzzling. That he never came out and said whether he did or whether he didn't have KS, but said that he was following the CDC guidelines and that there was no risk of anyone on our staff passing on an infectious disease through a physical exam.
 
 
 [2]
 Indeed, had the FBI made the appropriate inquiries, it likely would have learned early on that the hospital had an inadequate monitoring and supervision program for its infection control procedures. The FBI then may have been able to part ways with Dr. Doe without effecting a violation of the Rehabilitation Act. This information was not adduced until after Dr. Doe filed suit, however, and therefore cannot be a retroactive basis for the FBI's termination of Dr. Doe. McKennon v. Nashville Banner Publishing, 115 S. Ct. 879, 884 (1995)