Irina PETSCH–SCHMID

v.

BOSTON EDISON COMPANY, Alison Alden, and James Dillon.

Civil Action No. 92–11483.

United States District Court, D. Massachusetts.

Feb. 2, 1996.

Paul H. Merry, Garrity & Levin, Boston, MA, for plaintiff.

Keith B. Muntyan, Morgan, Brown & Joy, Boston, MA, for defendants.

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

STEARNS, District Judge.

After losing her job as a Human Resources Administrator at Boston Edison Company ("Edison"), plaintiff Irina Petsch–Schmid ("Schmid") brought a multi-count lawsuit against Edison and two of her former supervisors, Alison Alden and James Dillon. Earlier in the litigation, the court (by Judge Skinner) dismissed several counts of the Complaint.[1] Defendants now seek summary judgment on the counts that remain.[2]

### I. FACTS

The material facts, viewed in the light most flattering to the plaintiff as the nonmoving party, are as follows.[3] In 1987, Schmid was hired as a Human Resources Administrator in Edison's Organization and Development Department. In the late 1980's, Schmid began experiencing fatigue, dizziness, and visual disturbances, symptoms that her physician felt might signify the early stages of multiple sclerosis (MS). Schmid began taking Prozac, an anti-depressant medication. Despite her physical ailments, Schmid received largely positive performance reviews from her supervisors. In August of 1990, defendant Alison Alden was hired as Edison's Director of Organizational Development. Alden became Schmid's immediate supervisor.[4] Schmid came to believe that Alden was treating her unfairly in terms of work assignments. She also felt that Alden unduly interfered in the supervision of her subordinates. In December of 1990, Schmid complained to James Dillon, Edison's Director of Employee Relations, about Alden's managerial style. Schmid also disclosed to Dillon the fact that she was suffering from extreme fatigue and intended to seek an accommodation from Edison with respect to her working hours.[5] In March of 1991, Alden lowered Schmid's performance review to "meets expectations" and designated four areas as needing improvement.

In early 1991, Schmid was advised by her physician that sustained rest was necessary to manage her worsening health. On April 30, 1991, with Dillon present, Alden told Schmid that she was dissatisfied with her performance. Schmid raised the issue of her health in general terms, and asked what would happen if she were to seek a modified work schedule. Alden then asked Schmid if her health problem was permanent. When

---

1. The ten count Complaint was removed to federal court pursuant to 29 U.S.C. § 206(d). Judge Skinner eventually dismissed Count I (Breach of Contract), Count IV (Intentional Infliction of Emotional Distress), and Count V (Negligent Supervision and Retention) of the Complaint against Edison, and Count II (Handicap Discrimination) and Count III (Sex Discrimination) against the individual defendants.

2. The following counts remain:
 Count II (Handicap Discrimination) and Count III (Gender Discrimination) alleging violations of G.L. c. 151B against Edison.
 Count VI (Defamation) and Count VII (Interference with Advantageous Contractual Relations) against defendants Alden and Dillon.
 Count VIII (violation of the Equal Pay Act, 29 U.S.C. § 206(d), and a similar claim under state law) against Edison.
 Count IX (violation of G.L. c. 93, § 102–103) and Count X (Invasion of Privacy) against Edison.

3. Edison objects to the fact that Schmid's "Statement of Disputed and Undisputed Facts" fails in several material respects to comply with Local Rule 56.1. A number of "facts" are asserted without any documentary substantiation; others are vaguely referenced to entire documents without page numbers or other guidance. While I have made an effort to divine the source of Schmid's more oblique references, I have ignored those assertions of undisputed fact for which I can find no record support at all, and have disregarded those cites that are impenetrable or simply wrong. I have also incorporated material facts alleged by defendants that plaintiff does not dispute in her counter statement.

4. Schmid had competed for Alden's job. Three managers including Schmid, all of whom were female, reported to Alden. Schmid admits that she was unhappy at having to report to Alden.

5. Edison claims that Schmid first raised the issue of an accommodation with Dillon in April of 1991. Also according to Edison, Schmid told Dillon only that she had a neurological condition; she did not mention the possibility of MS.

Schmid replied that it was, Alden stated that if the problem was MS she would remove Schmid from her position and possibly terminate her employment. Alden and Dillon proposed that Schmid resign and accept a short term consultancy or a severance package. Schmid refused.

On May 13, 1991, Alden and Dillon told Schmid that unless she resigned, she would be placed on a remedial work plan. Schmid stated that she intended to seek a four day, ten hour per day work week as an accommodation for her MS. Alden asked Schmid to have her personal physician contact Edison's Medical Department to discuss her condition.[6] The following day, Schmid met with Dr. Jacqueline Hess, Edison's Medical Director. Dr. Hess explained that medical documentation, and perhaps test results, would have to be submitted before Edison would approve a restricted work schedule.[7] She also advised Schmid that she might lose her job if her condition was permanently debilitating. On May 30, 1991, Alden wrote a memorandum to Schmid restating Edison's policy on accommodating employees with disabilities and reminding Schmid of the necessity of substantiating her complaints to the Medical Department. Alden also informed Schmid that she personally saw no evidence that suggested that Schmid was incapable of performing the essential functions of her job.[8]

On May 28, 1991, Dr. Howard Weiner, the Director of the Multiple Sclerosis Clinical & Research Unit at Brigham & Women's Hospital wrote to Schmid's internist, Dr. Melvyn Kramer stating that Schmid's neurological examination disclosed no abnormalities and that it was "impossible to make a diagnosis of MS in [Schmid's] case based on history and physical examination."[9] On June 11, 1991, Dr. Kramer wrote to Dr. Hess discussing Schmid's condition in very general terms. Dr. Kramer described a ten hour, four day work week as "clinically mandatory" for Schmid. Dr. Hess was puzzled how a ten hour work day would address Schmid's complaints of fatigue. On June 18, Dr. Hess telephoned Dr. Kramer seeking additional medical information.[10] Dr. Hess met with Schmid on June 20 to explain that Dr. Kramer's letter was inadequate and that Schmid would be required to obtain a written evaluation from her neurologist.[11] On July 29, 1991, Schmid submitted a letter to Dr. Hess from her neurologist, Dr. Butler (the letter was dated July 15, 1991). Dr. Hess considered the letter unsatisfactory and wrote directly to Dr. Butler on July 30 seeking clarification of his evaluation of Schmid's clinical condition. She also asked Dr. Butler for a specific recommendation as to the type of accommodation that would best benefit Schmid. On August 9, 1991, Schmid wrote to Dr. Butler instructing him to provide Dr. Hess with only a bare minimum of information. Schmid was suspended before Dr. Hess received a reply from Dr. Butler.

Meanwhile, on May 23, 1991, Alden met with Schmid and told her that her performance was unsatisfactory. Alden specified ten areas as needing improvement. Alden also indicated that she intended to place Schmid on a remedial work plan. On June 5, 1991, Dillon formally offered Schmid a 3½ month severance package. Dillon repeated the warning that if Schmid did not accept separation, the remedial work plan would be instituted. The following day, Dillon demanded an answer within twenty-four hours.

6. According to Edison, at this meeting Schmid for the first time claimed to have MS.

7. Schmid agrees that Dr. Hess was not qualified to diagnose MS and thus obligated to rely on the evaluations of non-Edison specialists. Plaintiff's Statement of Undisputed Facts, No. 31. It appears from a careful reading of Schmid's Statement of Undisputed Facts that at no time was she ever diagnosed as actually suffering from MS.

8. Alden repeated the same observation in a letter to Dr. Hess on August 15, 1991, written to obtain information on Schmid's condition. Schmid has never claimed that she was unable to perform the functions of her job.

9. Schmid refused to submit to a recommended MRI, citing unconquerable claustrophobia.

10. Schmid does not contest the fact that Dr. Hess routinely spoke to the treating physicians of employees seeking restricted work schedules.

11. Dr. Hess wrote to Schmid on June 26, 1991, explaining in more detail what she required from the neurologist.

Schmid again refused to resign. On June 17, 1991, Alden presented Schmid with a three month work performance plan. (The plan was revised on July 17, 1991, after Schmid complained about its requirements.) Alden told Schmid that she would not be eligible for an intra-company transfer (one of the alternatives Schmid had considered) unless her performance improved. Alden increased Schmid's work assignments and imposed strict, short deadlines, stating that she expected Schmid to work weekends and to take work home. Despite the increased work load, Schmid accomplished all but one of the tasks that Alden assigned. On July 22, 1991, Alden nonetheless gave Schmid a negative review of her first month's performance on the plan.

On August 16, 1991, Alden returned from a vacation. When Alden learned that Schmid had not completed a training program task she had been assigned, Alden accused Schmid of deliberate sabotage and relieved her of responsibility for the program. As she left Alden's office, Schmid told Alden that, "I am going to print.... You'd better have a husband who has a good job because he is going to need to support you." Alden interpreted the remark as a threat.[12] Schmid was immediately suspended without pay. Dillon escorted Schmid to an elevator where a loud verbal exchange ensued. On August 21, 1991, Schmid was permanently discharged. Edison cited Schmid's outburst at Alden and her poor job performance as the grounds for termination.[13]

## II. DISCUSSION

### A. The Summary Judgment Standard

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact, and [where] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Gaskell v. Harvard Co-op Society, 3 F.3d 495, 497 (1st Cir.1993). "An issue is only 'genuine' if there is sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving party's favor." NASCO, Inc. v. Public Storage, Inc., 29 F.3d 28, 32 (1st Cir.1994). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247–248, 106 S.Ct. at 2510. A court evaluating a motion for summary judgment "must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 928 (1st Cir.1983).

Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. In Anderson v. Liberty Lobby, Inc., the Supreme Court addressed summary judgment in the context of a plaintiff's lack of proof of a material fact:

> [T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.... [I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.... The question here is whether a

---

12. Edison characterizes the remark as a threat by Schmid to cause Alden to be fired.

13. Some additional factual material will be referenced where relevant to a specific claim of Schmid's lawsuit.

jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not.

477 U.S. at 252, 254, 106 S.Ct. at 2512, 2513.

■ The heart of Schmid's lawsuit is a claim of disparate treatment. "Summary judgment is a disfavored remedy in the context of discrimination cases based on disparate treatment. . . . [T]he ultimate issue of discriminatory intent is a factual question, . . . The ultimate question of the defendants' state of mind is elusive and rarely is established by other than circumstantial evidence, which requires the jury to weigh the credibility of conflicting explanations of the adverse [employment] decision." *Blare v. Husky Injection Molding Systems Boston, Inc.*, 419 Mass. 437, 439–440, 646 N.E.2d 111 (1995) (footnote and citations omitted).[14] However, summary judgment is not inappropriate in all discrimination cases. *See, e.g., Brunner v. Stone & Webster Engineering Corp.*, 413 Mass. 698, 705, 603 N.E.2d 206 (1992) (granting summary judgment for defendant where plaintiff failed to offer sufficient evidence to carry the burden of persuasion on employer's discriminatory motive); *Lewis v. Area II Homecare for Senior Citizens, Inc.*, 397 Mass. 761, 770, 493 N.E.2d 867 (1986) (similar).

B. *Count II: Handicap Discrimination (G.L. c. 151B)*

Edison seeks summary judgment on two separate aspects of Schmid's claim of handicap discrimination.

1. Job Accommodation

■ Employers must "make reasonable efforts to accommodate the particular needs of 'qualified' handicapped individuals, i.e., those who are able to perform their jobs if employers make some effort to adjust the working situation." *Talbert Trading Co. v. Massachusetts Commission Against Discrimination*, 37 Mass.App.Ct. 56, 63, 636

N.E.2d 1351 (1994). The issue of reasonable accommodation "is only considered when a handicapped person is not able to perform the essential functions of the job." *Tate v. Department of Mental Health*, 419 Mass. 356, 362, 645 N.E.2d 1159 (1995). Edison points out that Schmid does not now, nor has she at any time claimed that she was unable to perform the essential functions of her job.

■ Schmid argues that simply because she could perform her job without an accommodation, it does not follow that Edison had no obligation to consider a request for an amelioration of her working conditions. See *Buckingham v. United States*, 998 F.2d 735, 740 (9th Cir.1993) ("[E]mployers are not relieved of their duty to accommodate when employees are already able to perform the essential functions of the job."). Cf. *McWright v. Alexander*, 982 F.2d 222, 227 (7th Cir.1992) ("The Rehabilitation Act calls for reasonable accommodations that permit handicapped individuals to lead normal lives, not merely accommodations that facilitate the performance of specific employment tasks."). While all of this may be true,[15] Schmid has produced no evidence that Edison unreasonably refused to grant her request for a restricted work schedule. Schmid concedes that Dr. Hess had never denied an Edison employee's documented request for a medically necessary work restriction. Plaintiff's Statement of Undisputed Facts, No. 47. Schmid also agrees that Dr. Hess was unqualified to make a diagnosis of MS on her own, and was thus forced to rely on the evaluations of other doctors. Id., No. 31. Finally, she has failed to produce any evidence that Dr. Hess acted unreasonably in insisting that she substantiate her medical needs. See *Doe by Lavery v. Attorney General*, 814 F.Supp. 844, 849 (N.D.Cal.1992), aff'd, 44 F.3d 715, 720–721 (9th Cir.1995). If there was delay in acting on Schmid's request, it is largely attributable to Schmid's slow responses to Dr. Hess's requests and

**14.** Massachusetts is a "pretext only" jurisdiction. A plaintiff is not required to produce evidence that the actual reason for an employer's adverse employment decision was discrimination to survive summary judgment, only that the employer's proffered reason was pretextual. *Blare,* 419 Mass. at 444–445, 646 N.E.2d 111.

**15.** The facts of these two cases are quite distinguishable, as Edison points out.

her concern that Dr. Butler disclose as little as possible about her condition.

### 2. Termination of Employment

■■■■ Schmid claims that she was discharged by Edison because of her supervisors' belief that she suffered from MS. To establish a prima facie case of handicap discrimination under G.L. c. 151B, Schmid must show that "she is a handicapped person, that, in spite of her handicap she is qualified for the position from which she was fired, and that she was fired solely because of her handicap." *Garrity v. United Airlines, Inc.,* 421 Mass. 55, 60, 653 N.E.2d 173 (1995).

Edison's primary argument is that Schmid cannot establish that the *sole* determinative factor in her discharge was her purported handicap, and that other factors, poor job performance and her threatening remark to Alden, motivated her termination. Edison also argues that Alden could not have fired Schmid for being afflicted with MS, because at the time Schmid was terminated, Alden had yet to receive confirmation from Dr. Hess as to the nature of Schmid's ailment. Schmid, as evidence of discrimination, cites Alden's April 1991 statement that Schmid would be demoted or terminated if she had MS.

■■■ Edison also makes the argument that Schmid was not (or was not believed to be) handicapped at the time she was fired, and therefore is not entitled to claim protection as a handicapped person. It would seem that the literal requirement of *Garrity v. United Airlines,* supra, that a plaintiff prove that she is a handicapped person, is somewhat overstated, as the result is no less pernicious if a person is discriminated against because she is *perceived* to be handicapped as it is if her condition is real. See *Shaare Tefila Congregation v. Cobb,* 785 F.2d 523, 528 et seq. (4th Cir.1986) (Murnaghan, J., dissenting), *rev'd,* 481 U.S. 615, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987). Moreover, there is no requirement that an employer know the precise nature of an individual's impairment to be found to have discriminated

against her. See *Ward v. Westvaco Corp.,* 859 F.Supp. 608, 616 (D.Mass.1994).

Schmid's evidence of a discriminatory termination turns on the truth of her assertion that Alden stated she would be demoted or fired if she was suffering from MS.[16] While Edison may be able to prove that other reasons contributed to, or were the true and exclusive explanation for Schmid's firing, credibility issues, particularly those delving into an actor's state of mind, cannot be resolved on summary judgment. Consequently, summary judgment will be granted to Edison on Schmid's claim that Edison failed to reasonably accommodate her handicap and denied on her claim that she was terminated because of Alden's belief that she was disabled.

### C. *Count III: Sex Discrimination*

■■■ Schmid also alleges gender discrimination on the part of Edison, more specifically, that Edison did not place male employees with similar performance problems on remedial plans, or did so only after prolonged probationary periods. She also alleges that she was ultimately discharged for an ostensible infraction far less severe than incidents for which male employees received only mild discipline. "In a disparate treatment case, the plaintiff has the burden of showing that she was treated differently 'from persons situated similarly in all relevant aspects.'" *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 17 (1st Cir.1994) (citations omitted). Edison cites several differences between Schmid and the males with whom she compares herself. First, none of the comparable males were supervised by Alden. Second, there is no evidence that other managers "responded to performance problems in the same way" as Alden. Third, none of the male employees threatened their supervisors. And finally, only female managers reported to Alden.

On the other hand, Schmid points to six men with arguably equivalent salaries and responsibilities who did not receive comparable discipline despite work problems at least as severe as those attributed to Schmid. For example, one allegedly comparable male em-

---

**16.** Alden denies making the statement.

ployee was never placed on a remedial plan despite two years of unsatisfactory ratings. Another was given such a plan some four years after being rated unsatisfactory. Yet another, after being held accountable for a serious power outage, was transferred but not terminated.[17] Schmid's evidence on this aspect of Count III is sufficiently well-developed to survive summary judgment.[18]

### D. *Count VI: Slander/Defamation*

 Count VI alleges defamation on the part of Alden and Dillon. "Defamation is the publication of material by one without a privilege to do so which ridicules or treats the plaintiff with contempt." *Correllas v. Viveiros*, 410 Mass. 314, 319, 572 N.E.2d 7 (1991). There is no requirement that a defamatory statement be communicated to a large or even substantial group of persons; it is enough that it be communicated to someone other than the person defamed. *Brauer v. Globe Newspaper Co.*, 351 Mass. 53, 56, 217 N.E.2d 736 (1966):

 Schmid alleges that she was defamed by the following:

(1) Dillon's statement to the Department of Employment and Training that she had behaved unprofessionally in threatening Alden;

(2) a statement attributed by Schmid to a consultant to Edison that Dillon had told another employee that Schmid had threatened Alden and would probably be fired as a result;

(3) a statement attributed by Schmid to the same consultant that Alden had told him that Schmid was a "performance problem;"

(4) a statement by Alden to Dr. Hess that Schmid's performance was deficient;[19]

(5) a statement attributed by Schmid to the aforementioned consultant that Alden's

secretary had told him that Schmid could not complete her work in time; and

(6) that Dillon raised his voice to her while escorting her out of the building on August 16, 1991, in the presence of other Edison employees.

The first five claims fail, either because they are absolutely privileged, as is instance (1), see G.L. c. 151A, § 46; or because they are based on unreliable hearsay, as are instances (2), (3) and (5); or because they are unambiguously statements of opinion rather than assertion of fact, as are instances (1), (2), (3), (4), and (5); or because they are not statements attributed to a named defendant, as is the case with instance (5); or because they are conditionally privileged, as is instance (4). See *Foley v. Polaroid Corp.*, 400 Mass. 82, 94–95, 508 N.E.2d 72 (1987).

As to instance (6), Schmid alleges that Dillon escorted her to the elevator after her suspension and spoke harshly to her in the presence of other Edison employees. In denying defendants' motion to dismiss this allegation, Judge Skinner wrote that "it is possible that the escort may have been conducted in such a manner as to communicate a defamatory statement to other employees about the plaintiff." Judge Skinner also noted that Schmid "may have difficulty in proving this claim." Schmid does not mention the incident in her Statement of Disputed and Undisputed Facts other than to say in a conclusory way that it is disputed "[w]hether defendants defamed [her]." Schmid's Memorandum in Opposition at p. 17, states that "[she] will also be able to come forward with evidence that the statements made about her both by words and conduct ... were false." She adds only that Dillon raised his voice in a demeaning manner while escorting her from the building. In her deposition, Schmid stated that two unnamed clerks may have heard Dillon. There is a serious question

---

**17.** To the extent that *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir.1992), can be read as Edison suggests, to require an employee to compare herself only with other employees disciplined by the same supervisor, I cannot agree, particularly where a company has instituted company-wide standards of discipline, as Edison has, intended to provide guidance to all company supervisors.

**18.** The same is not true with respect to her claim of pay discrimination under G.L. c. 151B for the same reasons that her Equal Pay Act claims fail.

**19.** Alden denies making the statement to Dr. Hess.

whether Schmid has met her burden with regard to this claim under *Celotex,* and her proof may not survive a directed verdict. I will, however, at this time resolve any doubt with respect to the Dillon incident in plaintiff's favor as I must. All other claims of defamation will be dismissed.

### E. *Count VII: Intentional Interference with Advantageous Relations*

Schmid alleges that Alden and Dillon interfered with her employment by making false reports to Edison management about her job performance and personal conduct. To carry her burden on this issue Schmid must show that Alden and Dillon intentionally interfered with her employment relationship with Edison and that the interference was improper in motive or means. *W. Oliver Tripp Co. v. American Hoechst Corp.,* 34 Mass.App.Ct. 744, 751–752, 616 N.E.2d 118 (1993).

Alden and Dillon cannot be held liable for tortious interference with Schmid's "advantageous relations" with Edison if their actions "interfering" with those relations were a privileged part of their duties as Schmid's supervisors. A supervisor cannot be held liable for bringing about an employee's discharge, unless the supervisor is acting out of a spiteful, malignant purpose that has no connection to the legitimate business interests of the employer. *Wright v. Shriners Hospital for Crippled Children,* 412 Mass. 469, 476, 589 N.E.2d 1241 (1992).

Schmid's allegations in this regard suffer from the same defect as do several of her other claims. She offers no facts, other than the unspecified assertion that Alden and Dillon "lied" to the senior official at Edison who ultimately approved her discharge. Schmid gives no clue as to what the contents of these lies were, other than the fact that Alden reported Schmid's undisputed and inappropriate remark which Alden (and Edison management) regarded as threatening and insu-

bordinate.[20] If the suggestion is that Alden's negative reviews of Schmid's performance was motivated by Alden's antipathy to persons suffering from MS, this is undermined by Schmid's own recitation of the facts. Schmid admits that her problems with Alden began long before she made Alden (or Dillon) aware of her condition.

Despite the shortcomings in her pleadings, indulging every possible inference in Schmid's favor, a reasonable jury might find that the combination of Alden's negative reviews of Schmid's performance, her suspicions of Schmid's medical condition, her attempts to pressure Schmid to resign, her imposition of a program of untoward discipline, her assignment of extra work despite Schmid's complaints of fatigue, and her complaint to management about Schmid's "threat," signifies a campaign of harassment motivated by personal animus rather than corporate interest. Consequently, with respect to Alden, summary judgment on this count will be denied. The result is different with respect to Dillon. Schmid alleges nothing that Dillon is supposed to have done that actually interfered with her employment relationship with Edison.[21]

### F. *Count VIII: Equal Pay Act*

Count VIII charges "Edison with fail[ing] or refus[ing] to compensate [Schmid] at the rate of compensation received by males performing the same functions and bearing the same responsibilities," in violation of the federal Equal Pay Act, 29 U.S.C. § 206(d) and its state analog, G.L. c. 149, § 105A. To carry her burden, Schmid must identify male employees holding positions requiring equal skill, effort and responsibility under similar working positions who were more generously compensated. *McMillan v. MSPCA,* 880 F.Supp. 900, 905–906 (D.Mass. 1995) (discussing Equal Pay Act); *Sears v.*

---

20. The only suggestion of substance Schmid offers is the assertion that Alden reported that she had not satisfied the requirements of her work improvement plan while Schmid insists that she had. Plaintiff's Statement of Undisputed Facts, No. 93. (Elsewhere she admits that she had not completed all of her assignments. Id., No. 79). Even if this allegation had been properly docu-

mented, it does not as a matter of law describe an instance of the kind of malignant, spiteful behavior that the tort requires.

21. Schmid, for example, never makes clear what role Dillon played, if any, in bringing about her discharge.

*The Patriot Ledger,* 7 MDLR 1283, 1314–1315 (1985) (discussing G.L. c. 151B).

This issue has been a matter of ongoing contention, culminating with a December 15, 1994 order by the court that the plaintiff identify those male employees with whom she deemed herself comparable by supplementing her answers to Edison's interrogatories. This Schmid chose not to do. In her Memorandum in Opposition, at 21–22, she cites deposition testimony in which she named male "counterparts" whom she contends received higher pay. This testimony, which plaintiff concedes does not comply with the tenor of the court's order, is not an acceptable substitute. Schmid admits that the men she named in her deposition were not comparable, but were instead paid more for doing dissimilar jobs that she believes required less skill, effort and responsibility. Id., at 22. Moreover, even if this were an acceptable response, Schmid has offered no facts in support of this assertion, only the assurance that she has "ample evidence" to support it. Because Schmid has not met her burden with respect to an essential element of her equal pay claim under both federal and state law, the count will be dismissed.

### G. Count IX: Massachusetts Equal Rights Act

G.L. c. 93, § 102 recognizes a private right of action to remedy discrimination based on gender in the making or enforcement of contracts. Section 103 authorizes a cause of action for discrimination based on a plaintiff's handicap. Count IX alleges that Edison violated both provisions by discharging Schmid because of her handicap and failing to compensate her adequately.

If a remedy under G.L. c. 151B is available to a plaintiff for the identical claims, a plaintiff may not pursue a separate remedy under G.L. c. 93. *Agin v. Federal White Cement,* 417 Mass. 669, 672, 632 N.E.2d 1197 (1994). Chapter 151B provides the exclusive remedy for claims of employment discrimination not based on preexisting tort law or constitutional protections. See *Charland v.*

*Muzi Motors,* 417 Mass. 580, 586, 631 N.E.2d 555 (1994). Additionally, both G.L. c. 149, § 105A, and c. 151B provide remedies for equal pay claims. See *Jancey v. School Committee of Everett,* 421 Mass. 482, 496, 658 N.E.2d 162 (1995). Consequently, Count IX will be dismissed.

### H. Count X: Invasion of Privacy

G.L. c. 214, § 1B, guarantees a "right against unreasonable, substantial, or serious interference with privacy." The defendants' intrusion must be "serious or substantial" to be actionable. *Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 409 Mass. 514, 519, 567 N.E.2d 912 (1991). However, an employer "has a conditional privilege to disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job." *Bratt v. IBM Corp.,* 392 Mass. 508, 509, 467 N.E.2d 126, 129 (1984).

In her Memorandum in Opposition, at 23–24, Schmid specifies three alleged invasions of her privacy: (1) that certain of Schmid's subordinates were made aware of her supervisors' opinion that she had work performance problems; (2) that a psychological profile of Schmid prepared by an outside consultant had been faxed to Alden via a facsimile machine serviced by "lower-level clerical personnel"; and (3) that Dr. Hess revealed information contained in Schmid's medical records in a telephone call to Dr. Kramer. These claims fail. The first fails because Schmid has offered no evidence that any of her subordinates were in fact informed of Alden's opinion of her deficiencies (assuming that such a communication would indeed be an unprivileged invasion of an employee's privacy). The second fails because Schmid offers only speculation that someone other than Alden and her secretary might have seen the faxed copy of her psychological profile.[22] The third fails because Schmid directed Dr. Hess to Dr. Kramer for verification of her condition and nothing Dr.

---

22. Schmid does not contest Edison's assertion that the fax was "secure," that is, that only Alden and her secretary had authorization to use it.

Hess is alleged to have said could be construed by a reasonable jury as inappropriate to a consultation between two doctors. This count therefore will be dismissed.

## ORDER

For the foregoing reasons, summary judgment is *DENIED* as to Count II, to so much of Count III as alleges discriminatory treatment in matters of employee discipline, to so much of Count VI as alleges defamatory conduct on the part of defendant Dillon in escorting Schmid from her place of employment and to so much of Count VII as alleges that Alden intentionally interfered with Schmid's employment relationship with Edison. In all other respects, summary judgment is *ALLOWED*. The Clerk will set the case for trial at 9:00 a.m., February 26, 1996.[23]

SO ORDERED.

---

**23.** I recognize that as a result of this decision, no federal claim remains in the case. The decision whether to retain supplemental jurisdiction is a matter of discretion. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). While the usual balance of factors—judicial economy, convenience, fairness and comity—points toward declining jurisdiction when all federal claims are eliminated, *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988), the rule is not inflexible. See *Newman v. Burgin*, 930 F.2d 955, 963–965 (1st Cir.1991). The court will, however, consider a request by either party to remand the case if filed on or before February 16, 1996.