Lee v. Dartmouth-Hitchcock          CV-94-521-SD  01/07/97 P

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


Kevin Lee

_____v.                              Civil No. 94-521-SD

Trustees of Dartmouth College;
Dartmouth-Hitchcock Medical Center;
Mary Hitchcock Memorial Hospital;
Richard L. Saunders


O R D E R


In this civil action, plaintiff Kevin Lee, M.D., alleges that the above-named defendants terminated his participation in the neurosurgery residency program at Mary Hitchcock Memorial Hospital in violation of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12117 (1995), and the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1985).

Presently before the court is the defendants' motion for summary judgment, to which plaintiff objects.


Background

In July of 1989 Dr. Lee entered the neurosurgery program at Mary Hitchcock Memorial Hospital (Hitchcock or Hospital), which is affiliated with Dartmouth College.  Although the neurosurgery

program involves seven years of training, Dr. Lee needed to complete only five years because he had already completed two years of training in general surgery.[1]

In his third year, while participating in a six-month rotation in neurology (required of residents) at the University of Michigan, Dr. Lee experienced numbness in his body below the waist. At the time, Dr. Lee thought he was suffering from a solvent-induced paresthesia because he recently had been exposed to an industrial solvent. He was told by his neurologist colleagues that his symptoms could last between six weeks and six months. However, when he returned to Hitchcock for the second half of his third year, his problems worsened, and he experienced a burning pain in his legs, buttocks, and waist.

In March of 1992, during the latter part of Dr. Lee's third year, an MRI was performed at Hitchcock that revealed a lesion in his lower thoracic spine. A neurologist opined that the lesion was probably consistent with a diagnosis of either multiple sclerosis (MS)[2] or other conditions. See Deposition of Kevin R. Lee, M.D., at 109 (attached to plaintiff's objection).

_____

[1]Not all neurosurgery residents begin their training with two years of general surgery; some start their training in neurosurgery immediately.

[2]MS is a debilitating disease that affects the central nervous system. Typically, the symptoms of lesions are weakness, incoordination, paresthesia, speech disturbances, and visual complaints. The course of the disease is usually prolonged. See Dorland's Illustrated Medical Dictionary 1496 (28th ed. 1994).

Following the MRI, Dr. Lee advised defendant Richard L. Saunders, M.D., chairman of the Hospital's neurosurgery department, that he needed to take one week off to be evaluated at the University of Michigan. Further tests were performed in Michigan, where plaintiff's physician determined that Dr. Lee was likely suffering from transverse myelitis, a less debilitating disease than MS.

When he returned to Hitchcock, Dr. Lee discussed the findings and results with Dr. Saunders. He then completed his third year of clinical surgical work without any accommodation or diminishment of his work load, although his symptoms in his lower body persisted.

In his fourth year, Dr. Lee left Hitchcock to perform research at the University of Michigan. While in Michigan, Dr. Lee met with a member of the Hitchcock neurosurgery staff, Dr. Perry Ball, who flew out in August of 1992 to discuss Dr. Lee's future in neurology. During the course of the conversation, Dr. Ball made statements indicating that he believed Dr. Lee was suffering from MS and impaired hand coordination. Lee Deposition at 140. Dr. Lee assured Dr. Ball that he had only one spinal lesion, therefore precluding a diagnosis of MS.

In March of 1993, Dr. Lee spoke with Dr. Saunders and stated that his condition had improved. He also said that although he would like to do additional research, he was ready to return to

clinical work at any time.  See Journal of Dr. Lee at 13
(attached to plaintiff's objection).  Dr. Saunders responded that
Dr. Lee could not return and that his disability could not be
accommodated.  See id. at 13-15.  Dr. Lee was subsequently
terminated from the program by letter from Dr. Saunders dated
May 6, 1993.  The reasons given for the termination were that (1)
Dr. Lee had not been able to pursue added clinical experience
because of his neurological symptoms and (2) a return to clinical
(surgical) service would be in the interest of neither Dr. Lee's
well-being nor patient care.  Subsequently, Dr. Lee's treating
neurologist sent Dr. Saunders a letter on Dr. Lee's behalf, but
Dr. Saunders remained unmoved.

Discussion

1.   Summary Judgment Standard

Summary judgment is appropriate when there is no genuine
issue of material fact and the moving party is entitled to a
judgment as a matter of law.  Rule 56(c), Fed. R. Civ. P.; Lehman
v. Prudential Ins. Co. of Am., 74 F.3d 323, 327 (1st Cir. 1996).
Since the purpose of summary judgment is issue finding, not issue
determination, the court's function at this stage "'is not [] to
weigh the evidence and determine the truth of the matter but to
determine whether there is a genuine issue for trial.'"  Stone &
Michaud Ins., Inc. v. Bank Five for Savings, 785 F. Supp. 1065,

4

1068 (D.N.H. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

When the non-moving party bears the burden of persuasion at trial, to avoid summary judgment he must make a "showing sufficient to establish the existence of [the] element[s] essential to [his] case." Celotex Corp. v. Catrett,, 477 U.S. 317, 322-23 (1986). It is not sufficient to "'rest upon mere allegation[s] or denials of his pleading.'" LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson, supra, 477 U.S. at 256), cert. denied, ___ U.S. ___, 114 S. Ct. 1398 (1994). Rather, to establish a trial-worthy issue, there must be enough competent evidence "to enable a finding favorable to the non-moving party." Id. at 842 (citations omitted).

In determining whether summary judgment is appropriate, the court construes the evidence and draws all justifiable inferences in the non-moving party's favor. Anderson, supra, 477 U.S. at 255. Nevertheless, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).

5

2. ADA and Rehabilitation Act Claims

Lee's claims under both the ADA and the Rehabilitation Act are based on his claim that he was discriminated against because of his perceived disability. Under the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a). Section 504 of the Rehabilitation Act of 1973, as amended, provides that "[n]o otherwise qualified handicapped individual . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal [funds]." 29 U.S.C. § 794.

In order for Lee to obtain relief under the ADA, he must prove three things: first, that he was disabled, or perceived as disabled, within the meaning of the Act, see Katz v. City Metal Co., Inc., 87 F.3d 26, 30 (1st Cir. 1996); second, that "with or without reasonable accommodation he was able to perform the essential functions of his job," i.e., that he was "otherwise qualified" to participate in the neurosurgical residency program, id.; and third, that the hospital discharged him in whole or in part because of his disability.[3] Id.

---

[3]An ADA plaintiff may use circumstantial evidence by employing the burden-shifting methods that originated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

6

a.  Perceived Disability

The initial inquiry focuses on whether Lee's neurological condition satisfies the "disability" element of his claim, as defined in the ADA.  An ADA plaintiff "must meet the threshold burden of establishing that he is 'disabled' within the meaning of the statute."  Roth v. Lutheran Gen. Hosp., 57 F.3d 1446, 1453-54 (7th Cir. 1995) (citations omitted).  "The inquiry is an individualized one, and must be determined on a case-by-case basis."  Id. at 1454 (citations omitted).  Under the ADA,[4] the term "disability" means with respect to an individual--

> (A) a physical or mental impairment that substan-
> tially limits one or more of the major life
> activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2) (ADA); 29 U.S.C. § 706(8)(B) (Rehabilitation Act of 1973, as amended).

Dr. Lee does not claim he has an actual impairment meeting the definition of section 12102(2)(A).  Rather, his sole contention is that he was perceived as having such impairment.  The phrase "regarded as having such an impairment" can mean that the

_____

[4]"Disability" as defined under the ADA is substantially equivalent to "disability" as defined under the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701-797 (1988 & Supp. 1996), and the court will look to case law interpreting both statutes when analyzing plaintiff's evidence of "disability". See Nedder v. Rivier College, 908 F. Supp. 66, 74 n.7 (D.N.H. 1995).

7

individual "has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation." 29 C.F.R. § 1630.2(l)(1). There are three elements to a perceived disability: (1) a perceived "physical or mental impairment," which (2) "substantially limits" (3) "major life activities." Soileau v. Guilford of Maine, Inc., 928 F. Supp 37, 46 (D. Me. 1996).

### (1) Impairment

Courts have consistently held that MS constitutes a physical impairment under the ADA.[5] See Iacampo v. Hasbro, Inc., 929 F. Supp. 562, 575 (D.R.I. 1996) (employee with MS stated prima facie claim under ADA); Pushkin v. Regents of Univ. of Colorado, 658 F.2d 1372, 1382 (10th Cir. 1981).

While Lee makes no assertion that he has MS, he claims that defendants' perception of his having MS falls within the ADA's "regarded as" having a "physical impairment" requirement. See

_____

[5]A physical impairment is defined as:

> Any physiological disorder, or condition, . . . affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory, cardiovascular . . . .

See 29 C.F.R. § 1630.2(h)(1) (1996). Furthermore, the regulations of the Department of Health and Human Services have listed multiple sclerosis as a specific disease that constitutes a physical impairment. 45 C.F.R. pt. 84, app. A, p. 348 (1995).

8

Petsch-Schmid v. Boston Edison Co., 914 F. Supp 697, 704 (D. Mass 1996) (genuine issues of material fact precluded summary judgment on question of whether employee was terminated in violation of Massachusetts antidiscrimination law due to her supervisor's belief that she had multiple sclerosis).  The court agrees.

In this case, the defendants were well aware of Lee's neurological problems.  An MRI performed at Hitchcock revealed a lesion across Lee's spinal cord. The presence of the lesion, coupled with symptoms affecting his legs, caused Lee to fear that he had MS.  Lee shared this fear with Dr. Colin Allen, a neurologist at the Hospital; Dr. David Roberts, an attending neurosurgeon at the Hospital; and Dr. Saunders.  Dr. Allen further informed Lee that the lesion was consistent with a diagnosis of MS.  Plaintiff's Exhibit 1, at 105-09.

Lee's condition was also discussed at meetings among the staff.  One meeting resulted in Dr. Ball's calling Lee and asking him if he was taking gluco-corticoids, drugs typically used in the treatment of MS.  Furthermore, Ball flew out to Michigan to speak with Lee about what his "options" were in neurosurgery and medicine.  During that conversation, Ball suggested that Lee resign because his options in neurosurgery were "bleak and dismal."  See Plaintiff's Exhibit 2, at 138.  Ball concluded his

visit by informing Lee that if he didn't resign, he would be fired. Id. at 150.

Subsequent meeting notes from September 1992 also indicate that Lee's "disability" was further discussed by the staff:

> Saunders and Ball brought the group up to the present relative to Kevin Lee's disability, and the sensitivities involved. It was agreed that Dr. Lee would have access to returning to the program, depending upon his well being. An end point on when this access would stop was not agreed upon. It is planned that Saunders will write of a positive nature supporting his return. The issue of when and if he goes on to disability will not be a neurosurgical issue, but an interaction between Lee and [the chairman].

Plaintiff's Exhibit 11, Neurosurgical Section Meeting Notes.

On the basis of the foregoing, the court concludes that, viewing the facts in the light most favorable to the plaintiff, a reasonable jury could find that the defendants perceived Lee as having MS, thereby meeting the physical impairment requirement of the ADA.

That Lee was perceived by the defendants as suffering from a physical impairment alone, however, does not qualify him as having a perceived disability under the ADA. See Aucutt v. Six Flags Over Mid-America, Inc., 85 F.3d 1311, 1319-20 (8th Cir. 1996) (employer who was aware of nondisabling medical problems did not regard plaintiff as disabled within the meaning of the ADA). Lee must show that "the perceived impairment substantially

10

limit[s] a major life activity."  Marschand v. Norfolk & Western

Ry., 876 F. Supp. 1528, 1540 (N.D. Ind. 1995), aff'd on other

grounds, 81 F.3d 714 (7th Cir. 1996); Soileau, supra, 928 F. Supp

at 48 (summary judgment granted because employee's chronic

depression, which constituted a mental impairment under the ADA,

did not substantially limit a major life activity); Dutcher v.

Ingalls Shipbuilding, 53 F.3d 723, 727 (5th Cir. 1995) ("A

physical impairment, standing alone, is not necessarily a dis-

ability as contemplated by the ADA;" this impairment must

substantially limit a major life activity).


#### (2) The "Substantially Limits" Requirement

The EEOC's implementing regulations define "major life

activities" to include "caring for oneself, performing manual

tasks, walking, seeing, hearing, speaking, breathing, learning,

and working."  See 29 C.F.R. § 1630.2(i).  In this case, plain-

tiff contends that the Hospital perceived his impairment to

interfere with two major life activities: (1) the ability to


11

learn, and (2) the ability to perform manual tasks.[6] <u>See</u> Plaintiff's Objection at 18.

The issue now becomes whether Lee's perceived impairment would "substantially limit" his ability to learn or to perform manual tasks.[7] Lee contends that the defendants thought he could not complete the last year in the program due to his perceived MS. Furthermore, plaintiff asserts that it was this misperception which resulted in the defendants' belief that the illness would substantially limit Lee's ability to learn the clinical aspects of neurosurgery as well as perform the manual tasks required for surgery, two tasks which constituted the majority of the program.

---

[6]In their motion for summary judgment, defendants argue that Lee was not perceived as substantially limited in his major life activity of "working," as he was capable of practicing other forms of medicine. <u>See</u> Defendants' Motion at 15. Plaintiff does not rebut this argument, and instead focuses on the two activities of "learning" and "manual tasks." <u>See</u> Plaintiff's Response at 18.

[7]Title 29 C.F.R. § 1630.2(j) defines "substantially limits" as:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

12

The EEOC's implementing regulations set forth, and courts have adopted, the following three factors to be considered in determining whether or not an impairment substantially limits a major life activity:

> (i) The nature and severity of the impairment,
> (ii) The duration or expected duration of the impairment, and
> (iii) The permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630(j)(2); Soileau, supra, 928 F. Supp at 48-49 (citations omitted). The Appendix to this regulation states that an impairment is substantially limiting if it significantly restricts a major life activity as compared to the average person.

Lee has offered evidence in support of his claim that defendants perceived him as being substantially limited in learning and performing manual tasks necessary to the neuro-surgical program. First, Lee points to Dr. Saunders' recommendation that he look into the neurosurgical resident disability policy. Plaintiff's Exhibit 2, and 113, 119; Plaintiff's Exhibit 11. Saunders reiterated this recommendation in a letter to Lee dated October 23, 1992:

> Anticipating that you will be unable to pursue further clinical neurosurgery in January 1993, you will be unable to begin your Chief Residency year in July, 1993. This being the case, we would expect you to be covered by the institutional dis-ability policy, with which you are familiar.

13

Plaintiff's Exhibit 8, Saunders Letter, Oct. 23, 1992.

In addition to references to the disability policy, it was suggested to Lee that he consider medical specialties other than neurosurgery. Dr. Ball, representing Dr. Saunders and the neurosurgery department, flew to Michigan in August of 1992 to discuss Lee's "options." Plaintiff's Exhibit 2, at 127. During their discussions, Ball offered three possible scenarios--improvement, no change in condition, and deterioration. Id. at 138. For each scenario, Ball explained to Lee why he should resign from the program. Id. Ball further indicated to Lee that the chance of improving was very small, and it was likely that he would deteriorate, thus indicating a long-term, progressive disease such as MS. Id. at 139. Ball also discussed the impact of Lee's neurological condition on his physical ability to perform as a neurosurgeon. He told Lee that he wouldn't be able to perform as a neurosurgeon because he wouldn't have the stamina or physical ability. Defendants' Exhibit 4, at 142. The discussion concluded with Ball's suggestion that Lee consider other areas of medicine, such as neurology, physiatry, and pathology. Id. at 145.

On the basis of the foregoing, a trier of fact could find that defendants perceived Lee's neurological symptoms as substantially limiting (or potentially limiting) his ability to

14

learn the clinical aspects of neurosurgery and/or to perform the necessary manual tasks needed in surgery. Although such specialized tasks may not by themselves qualify as "major life activities," the evidence suggests that defendants believed plaintiff's "MS" made him substantially more impaired than the average person and that they feared he would deteriorate and be unable to complete the program. Accordingly, viewing the evidence in a light most favorable to Lee, the court finds that a genuine issue of material fact exists as to whether defendants perceived Lee to be disabled. See Katz, supra, 87 F.3d at 23-33 (discussing when employer's fears that employee would develop subsequent illness could indicate employer regarded employee as disabled).

Alternatively, although plaintiff does not argue this, a factual issue exists as to whether defendants perceived him to be substantially impaired in the major life activity of working. "A person's expertise, background, and job expectations are relevant factors in defining the class of jobs used to determine whether an individual is disabled." Webb v. Garelick Mfg. Co., 94 F.3d 484, 487 (8th Cir. 1996). Certainly, a fact finder could determine that defendants viewed plaintiff as unable to be a surgeon, the class of job he had spent years training to become. In addition, defendants' concerns about plaintiff's deteriorating

15

health indicate that they considered him to be disqualified from an even broader range of jobs. See also Cook v. State of R.I., Dept. of Mental Health, Retardation & Hospitals, 10 F.3d 17, 26 (1st Cir. 1993).

### b. Qualified Individual

The analysis now turns to Lee's qualifications for participation in the neurosurgery program. The First Circuit has opined in interpreting the Rehabilitation Act that

> "[a]n otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." Southeastern Community Coll. v. Davis, 442 U.S. 397, 406 (1979). Although an employer is not required to be unfailingly correct in assessing a person's qualifications for a job, an employer cannot act solely on the basis of subjective beliefs. An unfounded assumption that an applicant is unqualified for a particular job, even if arrived at in good faith, is not sufficient to forestall liability under section 504.

Cook, supra, 10 F.3d at 26-27 (citation omitted). Federal regulations define a "qualified handicapped person" as one who, "with or without reasonable accommodation, can perform the essential functions of the position in question." 29 C.F.R. § 1630.2(m) (1996). The plaintiff bears the initial burden of establishing that he is entitled to protection under the Act. Taub v. Frank, 957 F.2d 8, 10 (1st Cir. 1992) (citing Pushkin, supra, 658 F.2d at 1385 (plaintiff must make prima facie showing

16

that he was "otherwise qualified" within the meaning of the Act and that the adverse employment action was taken solely because of his handicap)).

Defendants contend they are entitled to summary judgment because Lee was not qualified to complete the neurosurgery residency. In support of their position, defendants offer evidence relating to plaintiff's deteriorating surgical skills. Specifically, defendants cite Lee's difficulty in performing three operations during his third year in the program. After one of these operations, Dr. Robert Harbaugh, a neurosurgeon, wrote the following note to Dr. Saunders expressing his concern over Lee's surgical performance:

> Just a note to express my concern about Kevin Lee's performance since his return to the clinical service. Although we certainly had our concerns about Kevin's performance in the past (as you know from our conversations and discussions w/Kevin) I think that there has been a noticeable deterioration in his surgical skills since his return from L.A. and Michigan. Whereas in the past I attributed Kevin's difficulties to lack of concentration and initiative his recent performance in the OR has been clearly sub-standard. I think we should discuss this further as it raises real concerns about his ability to be an effective neurosurgical resident.

Plaintiff's Exhibit 8, at 38.

Defendants also offer Dr. Lee's 1992 performance evaluations as support for their position. In such evaluations, Lee received

17

a below average rating for his surgical skills from all four staff neurosurgeons. Defendants' Exhibit 4, 1992 Evaluations.

At the conclusion of Lee's third year, Dr. Saunders informed him that he needed to acquire additional clinical/surgical skills before returning for the fifth year as chief resident. Defendants' Exhibit 2 at 89. Lee did not obtain the additional clinical experience, nor did he return early from his fourth year to the Hospital. Id. at 108-12, 178-79.

Defendants therefore assert that their conclusions and decision that Lee was not otherwise qualified were based on the determinations of the Hospital's neurosurgery staff. While courts "should show great respect for the [staff's] professional judgment," if the plaintiff brings forth facts showing that these reasons are genuinely in dispute, summary judgment must be denied. See Carlin v. Trustees of Boston Univ., 907 F. Supp. 509, 511 (D. Mass. 1995).

Plaintiff asserts he was qualified to be in the program and further states he was unaware of any specific criticisms involving his surgical performance until defendants produced their EEOC submission. Plaintiff's Exhibit 6, at 12-14. While plaintiff admits he needed some additional surgical experience, he states that Dr. Saunders had informed him that he was still "magnitudes ahead of Perry Ball at this same stage in his

18

residency." Plaintiff's Exhibit 2, at 53-54. Lee also points out that his need for additional experience was due in part to his participation in the newly established pediatric rotation in Los Angeles, the participation being at Dr. Saunders' request. Id. at 34.

As for the performance evaluations, Lee points out that while his surgical skills were rated below average, not one of the four attending neurosurgeons indicated that Lee was not qualified to proceed in the program. Plaintiff's Exhibit 8, 1992 Evaluations. To the contrary, two surgeons, Dr. Joseph Phillips and Dr. Roberts, both stated "yes", without qualification, in response to whether Lee should continue. Id. Even Dr. Saunders wrote "yes", although he did place a question mark alongside.

Plaintiff also points to the Fair Hearing Policy of the defendants.[8] See Plaintiff's Exhibit 12. Such policy provides that a "resident whose non-academic performance does not meet department standards is entitled to a three month probation." Id. at 2. Furthermore, under such policy, the resident must receive written notification of the probation, have a private meeting with the department chairman to discuss the deficiencies,

_____

[8]The Fair Hearing Policy provides for a method to remediate a resident's academic and nonacademic deficiencies.

19

and be provided with a copy of the policy "at the meeting, or as soon as possible thereafter."  <u>Id.</u>

Plaintiff asserts that the defendants did not follow this policy, as he never had a private meeting discussing deficiencies, was never put on probation, and was never given notice of his probationary status.  Plaintiff's Exhibit 3, at 193-95.  Furthermore, Lee was not given a copy of the policy until two months after he had been dismissed from the program.  Plaintiff's Exhibit 8, Dr. Saunders' Letter of July 15, 1993.

In addition to the Fair Hearing Policy, Lee also points to Dr. Saunders' letters to him and to the American Board of Neurological Surgery.  The letter to Lee states,

> Reluctantly, we have decided not to renew your yearly contract this July for two reasons.  The first basis for our decision lies in the fact that you have not been able to pursue the added surgical experience we required of you a year ago, before starting your Chief year.  I realize that this was not feasible in light of your neurological symptoms, but it does not change the fact that this was a carefully considered requirement, in light of your surgical performance up to the spring of 1992.  The second reason for our decision is based on our March phone call, during which you described your persisting neurological symptoms, and requested another laboratory year for convalescence.  Although you agreed to return to clinical service if a second lab year was not possible, I would be remiss to allow this, in the interests of your well-being and patient care.  Our program is simply too small to have the flexibility needed to accommodate your need for more clinical experience and further convalescence.

20

Plaintiff's Exhibit 8, Dr. Saunders' Letter of May 6, 1993.

While this letter states that one of the reasons for his dismissal was due to his not being "able to pursue the added surgical experience" required of him, Dr. Saunders also goes on to state that the second reason was due to his "persisting neurological systems." Furthermore, the letter to the American Board of Neurological Surgery makes no mention of Lee's surgical performance. Rather, it states,

> Dr. Lee has been advised that his contract will not be renewed July 1 for his final neurosurgical residency year. Accordingly, for reasons of health, Dr. Lee has been dropped from the Dartmouth residency in neurological surgery.

Plaintiff's Exhibit 8, Dr. Saunders' Letter of June 10, 1993.

Based on the foregoing, the court finds that a genuine issue of material fact exists as to whether Dr. Lee was qualified to participate in the neurosurgical program.


c.  Dr. Saunders' Individual Liability

Defendant Saunders asserts that plaintiff's ADA claim against him in his individual capacity should be dismissed in accordance with this court's recent ruling in Miller v. CBC Cos., 908 F. Supp. 1054, 1065 (D.N.H. 1995). The court agrees and therefore grants summary judgment in favor of defendant Saunders on plaintiff's ADA claim.

21

Such a swift dismissal is not warranted, however, on plaintiff's claim under the Rehabilitation Act. A person who discriminates in violation of the Rehabilitation Act may be personally liable if he or she is in a position to accept or reject federal funds. See Johnson v. New York Hosp., 897 F. Supp. 83, 85 (S.D.N.Y. 1995). Plaintiff has not argued, and it does not appear to the court, that Dr. Saunders, who was chairman of the neurosurgical department at the Hospital, had the ability to make decisions regarding the acceptance or rejection of federal funds. However, in an abundance of caution, the court will grant Saunders' motion for summary judgment on the Rehabilitation Act claim only on condition that plaintiff does not submit evidence that Saunders possessed decisionmaking authority regarding the acceptance or refusal of federal assistance.

d. Dartmouth-Hitchcock Medical Center and Trustees of Dartmouth College

Defendants Dartmouth-Hitchcock Medical Center and Trustees of Dartmouth College argue that they are entitled to summary judgment because they were not plaintiff's employer. Plaintiff has not opposed the College's argument and has not offered any evidence that the College was his employer. Accordingly, the court grants summary judgment in favor of the College.

22

Plaintiff does, however, submit evidence supporting that Dartmouth-Hitchcock Medical Center was his employer. Specifically, plaintiff has attached one of his paychecks, on which the name of Dartmouth-Hitchcock Medical Center is printed. Accordingly, the court denies Dartmouth-Hitchcock Medical Center's motion for summary judgment.

<u>Conclusion</u>

For the reasons stated herein, defendants' motion for summary judgment is denied as to defendants Dartmouth-Hitchcock Medical Center and the Hospital, and is granted as to the trustees of Dartmouth College. Furthermore, the court grants summary judgment in favor of Saunders in his individual capacity on the ADA claim and conditionally grants Saunders summary judgment on the Rehabilitation Act claim, provided that plaintiff does not submit further evidence in accordance with this order by 4:30 p.m. on Thursday, January 16, 1997.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

January 7, 1997
cc:  Thomas G. Kraeger, Esq.
     Stephen Goethel, Esq.
     Byry D. Kennedy, Esq.
     David J. Kerman, Esq.

23